## DRAKELY *v.* GREGG.

1. If, with a full knowledge of the facts concerning it, a person ratify an agreement which another person has improperly made, concerning the property of the person ratifying, he thereby makes himself a party to it, as much so as if the original agreement had been made with him. No new consideration is required to support the ratification.

2. When evidence *tends* to prove a contract of a certain character, asserted by a party before a jury, a court should either submit the evidence on the point to the consideration of the jury, or if, in the opinion of the court, there are no material extraneous facts bearing on the question, and the contract relied on must be determined by a commercial cor-

respondence alone, then interpret this correspondence, and inform the jury whether or not it proves the contract to be of the character contended for by the party.

3. Accordingly, this court reversed a judgment, and ordered a *venire de novo* in a case where, in its opinion, the evidence below *tended* to prove a ratification and adoption by one person of a contract made by another, which ratification and adoption, the defendant maintained that the evidence did prove, or, at least, tend to prove. This court, however, in the reversal, carefully avoided the expression of any opinion as to whether the evidence, which it said *tended* to prove such ratification and adoption, did, or did not actually prove it.

In error to the Circuit Court of the United States for the District of Maryland.

The controversy grew out of the last of three shipments of pork products, in January, 1865, to Drakely & Fenton, of Baltimore, by McCabe & Co., of Chicago. Drakely & Fenton had agreed to receive, on consignment, from McCabe & Co., *hams*, shoulders, prime and new pork; to sell the property at the highest market price, and to advance, on each shipment, at certain specified rates. In pursuance of this understanding, McCabe & Co. made two shipments, one of barrelled meat, and the other of shoulders, in tierces, on which they drew drafts in favor of Gregg & Hughes to the amount of $59,000 which were paid.

Soon after this the *hams* were sent. On the day succeeding their shipment, the Baltimore firm received a telegram, which was followed by a letter from Gregg & Hughes, of Chicago, claiming title to all the property, and requesting that the bills of lading for the hams might not be negotiated until the whole matter was properly adjusted; and, until then, Drakely & Fenton did not know that Gregg & Hughes had any interest in the property consigned to them. It seemed, from Gregg & Hughes's letter, that they had furnished McCabe & Co. with money to cut and pack hogs, and had taken in security, the warehouse receipts on all the pork products, which afterwards came into the possession of Drakely & Fenton. The intervention of Gregg & Hughes resulted in nothing more being paid to McCabe & Co., and in a final direction from McCabe & Co. to Drakely & Fenton, to place

the proceeds of all the pork products consigned to them, to the credit of Gregg & Hughes.

It appeared, from the conduct of the parties, that there was no apprehension, until long after Gregg & Hughes had intervened, that the portion of these products, covered by the two first shipments, would not bring, when sold, enough to reimburse Drakely & Fenton for what they had advanced on them. But it so happened, in the vicissitudes of trade, that the hog market greatly declined, and that the proceeds of the pork and shoulders were inadequate to repay the money which was advanced upon them. The hams having sold for a large sum over charges and advancements, Drakely & Fenton insisted that they were entitled to a lien on the proceeds, for their general balance arising out of the deficiency on the sale of the pork and shoulders, which right was denied by Gregg & Hughes, and hence this litigation.

The question depended, of course, upon the fact, whether the intervention of Gregg & Hughes had changed the relation of principal and factor, which had previously existed between McCabe & Co. and Drakely & Fenton, and separated the consignment of hams from the preceding consignments. This, of course, was a question depending on the terms on which the hams had been received.

The evidence, on this point, consisted of a long correspondence, and of some oral testimony. The transactions originated with a letter from McCabe & Co. to the Baltimore house, as follows:

CHICAGO, January 6th, 1865.

MESSRS. DRAKELY & FENTON, BALTIMORE.

DEAR SIRS : I have about one thousand tierces of pickled hams, and five hundred tierces of pickled shoulders, with some mess, prime mess, and extra prime, which I would like to send to you, provided you think you could sell for good prices. Please let me know what you could get for the above, to arrive, and what amount you would allow me to draw on the shipment.

Yours, truly,

R. McCABE & Co.

The property here referred to, pork, shoulders, and hams,

was, all of it, confessedly, at the date of the letter, the property of Gregg & Hughes, by virtue of the warehouse receipts already mentioned. On the 10th January, Drakely & Fenton reply, as follows:

BALTIMORE, January 10th, 1865.

MESSRS. R. MCCABE & Co., CHICAGO.

GENTLEMEN: Yours of 6th instant came to hand this morning. [Here prices are given.] We would be pleased to receive consignments from you, and would advance you as follows, on sight drafts, accompanied with bills of lading; on pickled hams, say $40 per tierce; do. shoulders, $30 per tierce; mess pork, $30 per barrel; P. M. pork, $25 per barrel.

Very respectfully, yours,

DRAKELY & FENTON.

The present litigation had reference, mainly, to 983 of the 1000 tierces of hams, the first-mentioned article in both of the foregoing letters.

Satisfied, apparently, with the terms of Drakely & Fenton, McCabe & Co. write, as follows:

CHICAGO, January 13th, 1865.

MESSRS. DRAKELY & FENTON, BALTIMORE.

DEAR SIRS: Yours of 10th is before me; I will ship to you, by the 16th, fifteen hundred barrels pork, and, probably, will ship one thousand tierces of hams, and six hundred tierces of shoulders, next week. I will draw on the fifteen hundred barrels on the 16th, as directed by you, for about $42,000.

Truly yours,

R. MCCABE & Co.

On the 16th of January, McCabe & Co. forwarded the pork described in letters of that date, of which the following is an extract:

" On the terms enumerated, I have drawn on you to the order of Gregg & Hughes for $41,000. I will ship to order about six hundred tierces of shoulders, and, on Thursday, I will ship the hams. I hope you will put the property in store, on arrival, until I come on, which will be in February."

On the 17th January, McCabe & Co. write again to Drakely & Fenton, informing them of a shipment of " six hundred and three tierces of shoulders," and saying : " I will ship the hams next week, if I can get cars."

The bill of lading for the nine hundred and eighty-three tierces of hams is dated January 23d, 1865, which was Tuesday ; but the hams appear to have been forwarded, in fact, on Sunday ; and on Monday, 22d, Gregg & Hughes telegraphed Drakely & Fenton, as follows :

CHICAGO, January 22d, 1865.

Don't negotiate bill lading for nine hundred and eighty-three tierces of hams, shipped yesterday by McCabe & Co., consigned to you ; hams belong to us. Particulars by mail. Answer.

GREGG & HUGHES.

This was the first intimation that Drakely & Fenton had, of Gregg & Hughes's interest in the property mentioned in the original letter of McCabe & Co. of January 6th, or any part of it. The letter promised by the telegram, and of the same date, followed in course. It was thus :

CHICAGO, January 22d, 1865.

MESSRS. DRAKELY & FENTON, BALTIMORE.

GENTLEMEN : We have been advancing large sums of money, during the past winter, to R. McCabe & Co., of this city, to pack pork with, and have been getting from them their warehouse receipts, with policy of insurance, covering the same security. We have been shipping the property to New York on B. L. in our name, where it was held for our account. *Some few days ago, Col. McCabe, of the firm named, handed us a letter from your house, authorizing them to make sight drafts on you, on the basis of certain figures therein named, the drafts to be accompanied by B. L.* These shipments they made without our knowledge in their own name, *and gave us only a portion of the proceeds of the drafts made on you, payable to our order, viz., one for* $41,000, *and another for* $18,000. TO THIS WE DID NOT MAKE ANY SERIOUS OBJECTION, as they had been cutting a few hogs with money obtained from another source, and we presumed they wanted to close that account. There was still a considerable quantity of lard and hams remaining here, which we supposed was sufficient to secure us for our

advances here, in addition to what we had in New York. Subsequently, they shipped the lard to you, on their own account, for which we got nothing yet. Col. McCabe, however, told us that we should have the benefit of anything that might be in your hands, from the sale of the property shipped you on B. L. in the name of McCabe & Co., the lard included, after your advances and charges were paid. *We were satisfied with that arrangement, and on Friday last proposed that we would ship to you, in a few days, the hams that were still here, there being then about a thousand tierces in which we were interested, and we would not draw anything upon them until they were sold.* Col. McCabe told us, at that time, he would leave on Saturday morning for New York, *and we were to attend to the shipping of the hams ourself.* To our surprise, this morning (Monday), we found that McCabe did not go to New York, as contemplated, but remained here and shipped the hams himself to your house, on yesterday (Sunday), and this morning left for your city himself. Now, the last move, to us, does not look right, and we are not satisfied with it. We, consequently, write to you *all the facts* in connection with our dealings with McCabe & Co., and will deem it an especial favor, *if you will hold off making further advances to them, over and above the $41,000 and $18,000 sight drafts drawn in our favor. The property shipped you is virtually and legally ours, and we hold McCabe's warehouse receipts for it.* If you will delay the payment of anything further to McCabe & Co. until we can advise with them, and direct the property to be placed with you for our account, we will feel very grateful to you; and if they refuse to comply with our request, we can then take steps to make them surrender the property or reimburse us for our advances. . . .

*We do not wish your interests in the matter to be impaired in the least; we want you to sell all the property consigned to you; but we do not want the proceeds paid over to McCabe & Co., until we are secured, nor do we want any sale for the future made, unless the sales are placed to our credit.* McCabe & Co. may have the very best intentions in this matter, and we hope they have, but the course pursued is not exactly as we would have done, and we think very strange of McCabe & Co., for having moved *property belonging to us without our consent.* We desire that they shall have the benefit of everything *the pork, lard shoulders, and hams bring over the amount* we have in them. . . . .       Yours,

                                                    GREGG & HUGHES.

On the 31st of January, 1865, Gregg & Hughes. write:

"We have in our former letter notified you that the property consigned to you by R. McCabe & Co., of this city, belongs to us. We again notify you that *all the pork products* shipped to you by McCabe & Co., is ours, and you must not negotiate for advances on the same *with any other parties but us.* We also notify you not to divest yourselves of the control of any of the property, by assigning B. L., or in any other way, as you, we are legally advised, are responsible to us. You will consequently please confer with us in future, in regard to the disposal of said property. . . . . You will distinctly understand, that if you dispose of, in any way, the property *consigned to you by R. McCabe & Co.,* without our consent, that we will hold you responsible for the value of it."

Drakely & Fenton reply, February 3d, 1865, and say:

"We have decided to be governed by your instructions as to retaining the control of the goods, or proceeds of them, and we now assure you we have no wish to embarrass you, and will do all in our power to protect your interests."

On the 6th February, Gregg & Hughes wrote to Drakely & Fenton, and after speaking of some lard, which McCabe & Co. were to have let them have, but did not, say:

"In place of it he agreed that we should not only have the proceeds of sale of the 983 tierces hams shipped to you, *but also all property of the brand of R. McCabe & Co., in your hands.* . . . *We claim the whole property—the hams, pork, and shoulders. Our receipts cover them.*"

On the 9th February, 1865, Drakely & Fenton, writing to Gregg & Hughes, say:

"In naming figures we would advance to McC. & Co., we based our calculation on at least 300 lbs. tierces ham and shoulder (we have generally found 300 to 320 the net weight of Ohio and Indiana tierces) McC. & Co., we find so far as examined, weigh 280 to 290. . *We name this now,* as we shall, when you and Mr. McC. get the matter straightened so that we shall know in whose name to keep our account, make a new estimate, based on the actual weight of the hams and shoulders, *and the depreciated market for all the goods, so that if an advance is required on the*

*hams, fix an amount low enough to give good margins on all the shipments."*

This letter refers to the letter of the 10th January, fixing the rate of advances, shown by R. McCabe to Gregg & Hughes.

The letter in reply is dated February 11th, *and made no comment* on the subject of the passage last above quoted in long primer.

The next letter is dated February 22d. This was also *silent upon that subject.*

The next, dated February 27th, says:

*"We hand you memorandum of property in your hands which our order covers, subject to two drafts made by McCabe & Co. on you, with transportation and other regular charges,"*

and they add their thanks "for the very liberal and just course" pursued by Drakely & Fenton in the premises. In this same they ask for an advance of $25,000, saying that it was below that promised to McCabe.

The memorandum referred to in the letter as inclosed, had a list of items of the property, *and the hams were among them.*

Drakely & Fenton, on the 2d of March, acknowledging the receipt of the last-quoted letter of the 27th February, whose contents they say they have carefully noted, consented to make a further advance of $25,000, and subsequently did actually advance $10,000.

In advancing that,—in a letter of the 6th of March, after mentioning that they had received from the smoke-house some of "a few tierces each, of Messrs. R. McCabe & Co.'s hams and shoulders," and that more than half came out tainted—they say,

"Under these circumstances and looking solely *to the goods as security for advances,* we cannot now make the advance we proposed to do in ours of the 2d. With the most liberal estimate we can make, we have decided that $10,000 is as much *as we can add to previous advances."*

In a letter of the 15th of March, acknowledging the re-

ceipt of the letter of the 8th, Gregg & Hughes, recognizing apparently the reasons of Drakely & Fenton, confined themselves to saying:

"We regret that you could not consistently place more than $10,000 for us in New York. . . . We hope you may find it convenient yet to place some more for us, which we will deem as an especial favor."

On the 8th of March—apparently before Gregg & Hughes had received Drakely & Fenton's letter of the 6th—the former write:

"We herein inclose to you Col. McCabe's order on you for the pork products." "In regard to the sales of the stuff, we will place the matter entirely in your own hands, to use your judgment and discretion as to the best time to sell."

The order inclosed in the letter was as follows:

CHICAGO, February 25th, 1869.

MESSRS. DRAKELY & FENTON, BALTIMORE.

GENTLEMEN: You will please place the proceeds of all the pork products consigned to you by us to the credit of Messrs. Gregg & Hughes, of Chicago, Illinois, and oblige

Yours, &c.,

R. McCABE & CO.

Accepted, March 20th, 1865.

In the already mentioned letter of the 15th March, Gregg & Hughes say:

"In regard to holding on to the property for any great length of time, we can only say that it is not our desire to do so if we can avoid it without sacrificing it." "We certainly do not wish to hold the hams and shoulders until warm weather, and hope you will be able to sell them before that time. If anything is to be held, let it be the pork."

On the 20th March, Drakely & Fenton write:

"As the market is now we cannot estimate *the entire shipments of McCabe & Co.* to a figure any greater than we now have in them; and had the business been consummated, as we originally hoped, we should no doubt ere this have been compelled to ask for a margin."

On the 29th March, acknowledging the receipt of it, Gregg & Hughes speak of an improvement in the market, and say :

"While we are exceedingly anxious to have the property in your hands disposed of, as we could use the money invested to a good advantage, we would not urge the sale of it hastily, if the prospect of a further advance is any way flattering."

Again, on the 25th April, they write :

"We hope that you will soon be able to dispose of some of the hams and shoulders at good prices, and the pork also; we think, however, it would be better to hold the pork longer than the other stuff. Please give us your views on that point. Our New York balances will require us to place some funds there very soon, *and as we have calculated on the consignments to you to help us through,* we beg leave to ask you whether with the present prospects, you could not within a few days place $5000 with Hennings, Flint & Pearce, and accept our 30 and 60 day bills on you for $10,000 more, favor of Messrs. David Dowse & Co., being a total of $15,000. If you can favor us in this way it will enable us to hold some property that may be greatly to our advantage to not have disposed of at present."

On the 8th April, Drakely & Fenton write to Gregg & Hughes :

"Making the best estimate we can, the advances already made are larger than we would make now on a duplicate shipment."

In reply to this letter, Gregg & Hughes write, April 14th :

"We regret that you felt constrained to advance no more than the $10,000 you sent to New York on *our* 983 hams—the advance you made on the pork and shoulders was more liberal."

On the 22d April, Gregg & Hughes write again :

"Please give us your views generally concerning the condition of the property you hold for us, and the price you can get, also the prospect of selling at an early day."

On the 3d May, Gregg & Hughes write again:

"We would be glad of your views as *to the net value* of the property you have for us, at present market rates. We, of course, know you cannot tell exactly what it would sell for, but

we suppose you can form an opinion somewhere near its value. We would be pleased to have you furnish us with your account sales of each lot sold, *and your account current when all is closed out.* We can then keep the run of how the stuff is selling, and might be governed somewhat in selling off rapidly or gradually."

To this letter Drakely & Fenton reply on the 8th May :

"We have made a rough estimate of your whole provision business, based on present nominal prices, and the net balance is about $10,000."

Now, as was asserted by Drakely & Fenton, and not until now, as they asserted, began a change in the character of the correspondence of Gregg & Hughes, which change, as they assert further, led to the present litigation.

Gregg & Hughes, on the 12th May, write to Drakely & Fenton thus :

"We hope you have been able to dispose of the greater portion, if not all, of *our hams* by this time, at good prices, as also *some of the other portions of McCabe & Co.*, the proceeds of which, over and above your charges and advances on them, is to be placed to our credit."

Here, it will be observed, " our hams " and " portions of McCabe & Co." are referred to as properties in the hands of Drakely & Fenton, belonging to different parties.

In a letter of May 22d, " our hams " are again spoken of, and Drakely & Fenton are told :

"You will please keep the ham account separate. . . . The ham account sales, you understand, will be made direct to us. . . . The pork and shoulders will be made out to McCabe & Co. for our use; we do not want to get the property confused by running it all together. The hams are *exclusively* ours, and the other stuff, we are to have the benefit of what may be in your hands when sold, after deducting your advances and charges on the same."

A letter of Gregg & Hughes of May 31st, speaks of " our hams and McCabe & Co.'s stuff."

Drakely & Fenton, however, did not recognize the distinc-

tion taken by Gregg & Hughes, and say,. in a letter of June 5th :

" We do not propose to change the aspect of our relations to you as assignees of McCabe & Co., to receive from us whatever balance may be due them when their consignment of hams, shoulders, and pork, shall have been closed."

On the 27th June, Gregg & Hughes use the term " *our hams*" twice; and in a letter of the 8th July, Drakely & Fenton inform Gregg & Hughes that they have been " pushing off the *McCabe hams* as rapidly as possible." Again, on the 15th July, Gregg & Hughes speak of " our hams; " again, on the 20th; again, on the 29th.

The correspondence closes with a letter from Gregg & Hughes of September 16th, 1865, in which they present their view of the case thus :

" You say that you cannot recognize any distinction in the ownership of the hams, shoulders, and pork, that you received from McCabe & Co. and ourselves, and are not willing to make any further advances on them, until all is disposed of. Now, gentlemen, this is rather a singular view you take of the matter, and a novel construction you place on our account; you certainly were aware, from the beginning, that the 983 tierces. of hams belonged exclusively to us, and you also know, that we were to have the benefit of the excess over and above your advances of the sales of the provisions shipped you direct by McC. & Co. They drew on bills of lading as per your proposal in your letter to them, dated January 10th, 1865; the hams, they had no right to value against, and did not do so, which you are well aware of; we were the exclusive owners of the hams, and did not draw against them ourselves, which you are also aware of; we had you remit some money for our account to N. Y., which we expect to have charged up to our ham account, and the balance subject to our draft. Now this is a plain statement of the case, and we hope that we may not have occasion to discuss the subject any further. You dishonored our draft, after holding out the idea that you would place the amount it was for to our New York correspondents. And now we feel as though we want our own account closed, and will hope to get your report of the sales of the pork and

shoulders at an early day, so that we may get some benefit from that."

The parties having now arrived at an issue between themselves, Gregg & Hughes brought this suit against Drakely & Fenton, to recover the proceeds of the hams discharged of the factors' liens, for advances to McCabe & Co.

Mr. Hughes, of the firm of Gregg & Hughes, was examined on the trial, and stated that there was no agreement by them, that the hams should be subject to the drafts of McCabe & Co.; and being asked to look at the letter of the 27th of January, and to explain the circumstances attending the writing of it, said, that the firm did not consider itself as " writing with legal precision, but to mercantile correspondents, whose good faith, it was supposed, would be above taking advantage of a loose phrase, the meaning of which they perfectly understood." There was some other oral testimony.

The evidence being closed, the defendant's counsel asked the court to give these instructions, to wit:

" If the jury shall believe, from the whole of the evidence in the cause, that the plaintiffs were the owners of the property described in the memorandum attached to the letter of the 27th January, 1865, and that the same was referred to in the order, in evidence, of the 25th February, 1865, and although they may have been ignorant, at the time of each consignment of the several portions of said property, of the fact, that it was being made to the defendants, yet, if the jury shall believe that the plaintiffs subsequently recognized and acquiesced in such consignment, and received advances thereon, as well the hams as pork and shoulders, and assumed and exercised the control of owners of all the said property, without discrimination, then there is evidence, from which the jury may infer that the relation of principal and factor was established with regard to the whole of the consignment, offered in evidence, pork, shoulders, and hams, in which event, the defendants would be authorized to retain from the net proceeds of the consignments, the amount of their advances, with interest, and the verdict must be for such sum only as remains, after deducting said advances from the net proceeds aforesaid."

But the court did not give such instructions, either in the form asked, or in substance otherwise; but taking the view, that admitting the construction put by the defendants on the letter of the 27th February, 1865 (in the memorandum appended to which the hams were included), there was no consideration for the responsibility insisted on, put the case to the jury on the single issue of legal title in Gregg & Hughes, and notice of it to Drakely & Fenton.

Verdict and judgment having been given for the plaintiffs, Gregg & Hughes, the other side, brought the case here on error; the ground of exception being, that the court below erred in submitting the case to the jury, upon the simple questions of legal title to the hams in the defendants in error, and notice of that title given to the plaintiffs in error; that, on the contrary, the court should either have itself construed the agreement between the parties, as appearing in the documentary evidence, or more properly under the circumstances of this case, have submitted to the jury, as the appropriate tribunal, to find, from the evidence, what was the true agreement between the parties.

*Messrs. Latrobe and Steele, for the plaintiff in error:*

The letter of January 22d is the statement by Gregg & Hughes, of "*all the facts.*" It admits, that they held warehouse receipts for *all* the property that had been consigned to Drakely & Fenton; that their title to the hams was no better than their title to the pork and shoulders, but was the same; that they saw the letter by which Drakely & Fenton agreed to make advances; that the advances on the first consignments made, to use their own language, " on the basis of certain figures named " in Drakely & Fenton's letter of the 10th of January, were in drafts to their own order, a part of the proceeds of which they gave to McCabe & Co., to enable them to close an account with other parties.

It admits, moreover, that, although the first consignment of the property of Gregg & Hughes, was made without authority by McCabe & Co., yet that they made " no serious objections to it;" in other words they ratified it, and received

the proceeds of it, availing themselves of the act of McCabe & Co. as their agents in the premises; that (with a knowledge of the letter of Drakely & Fenton, of January 10th, 1865), they proposed to send to them, the same consignees that McCabe & Co. had employed, the property, which, but for the negotiation opened by McCabe & Co.'s letters of January 6th, and which alone introduced Drakely & Fenton into the transaction, would have been sent to New York.

In this letter, Gregg & Hughes propose, in fact, to place themselves in the shoes of McCabe & Co., as regards the property consigned by them to Drakely & Fenton, pork, shoulders, and hams; and although they say, they had *not* proposed to draw, had they themselves made the shipment of the hams, until they were sold, yet, they did obtain advances on them, as has been seen already, from the correspondence, making a reference, at the time, to the letter of Drakely & Fenton of the 10th of January, which was "the basis" of the transaction.

They claim also in this letter, the proceeds, not of the hams only, but of *all* the pork products consigned by McCabe & Co. to Drakely & Fenton.

The same letter admits that it was McCabe's conduct, in forwarding the hams, that created distrust, and produced their telegram and letter of January 22d.

Paraphrased, the letter is as follows: "McCabe & Co. sent you our property without our knowledge; when they informed us of the fact, showed us your letter, and drew drafts for the advance you had agreed to make, payable to our order, we made no objection; and proposed ourselves to send you the balance of the property which they had promised. Finding, however, that they had themselves forwarded it, we distrust them, and while we sanction and adopt the selection of your firm *as the consignees of all the property*, we give you notice of *our title to all the property* and request you to hold off making further advances to McCabe & Co."

These admissions prove the transaction to have been one, where the owners of property, after permitting an agent to establish in his own name relations with a third party, or,

which is the same thing, not objecting to those relations. when he learns they have been established, but availing himself of them, becomes dissatisfied, discloses his ownership, and takes upon himself the further conduct of the business. In other words, the case is one in which the principal, intervening in a transaction between his agent and a factor, has recognized their relations and proceeded to carry them out. That in such a case, the factor would have a lien for his general balance is so clear, that the point need not be discussed.

The main question, then, is one of fact. Did Gregg & Hughes recognize the relation of principal and factor, established between McCabe & Co. and Drakely & Fenton by the correspondence and acts of the parties respectively, and assume the obligations thereby created in regard to *all* the property, pork, shoulders, and hams, consigned by the former to the latter?

McCabe & Co.'s letter of the 6th January, proposed to forward *pork, shoulders, and hams*, mentioning the quantities, and inquiring about advances. Drakely & Fenton's letter of 10th January, states what advances will be made. McCabe & Co., January 13th, 1865, advise that shipments will be made accordingly, on the 16th, of the pork; and that the hams and shoulders will go forward the next week. The pork and shoulders go forward accordingly, and drafts amounting to $59,000 are paid. The hams are forwarded also, as promised, *by the same parties*, on the 21st January, with a bill of lading dated the 23d.

Gregg & Hughes intervene on the 22d. Had they not intervened, there would have been no question as to the right of Drakely & Fenton to a lien for their general balance. Their letter of 22d January is a portion of the evidence relied on, to show that this intervention was but the substitution of a principal in place of an agent in dealings with a factor. Was there a reason for such a substitution? Touching *all* the property, pork, shoulders, and hams, McCabe & Co. were but agents dealing with the property of their principal, whose absolute title was the warehouse receipts.

The conduct of the agents exciting distrust, there was a reason why the principal should substitute himself in their place.

. From the use of the words *all of the property*, in the letter of 22d January, it would be fair to argue that not only the hams, the consignment of which was the occasion of that letter, but the pork and shoulders were meant. The next sentence, however, removes all doubt on this score. "We desire that they shall have the benefit of everything, *the pork, lard, shoulders, and hams*, bring over the amount we have on them." Here then was a setting up of ownership of *all* the property, assuming the control of *all* of it.

The subsequent correspondence corroborates this view, and shows that Gregg & Hughes stepped into the place of R. McCabe & Co., in *all* respects as regards *all* the property. . Indeed, it is difficult to see how Gregg & Hughes could make their determination to deal with *all the pork products* consigned to Drakely & Fenton by McCabe & Co., as their own particular property, plainer than they have done by their letter of 31st January, 1865. Then comes the letter of Drakely & Fenton to Gregg & Hughes, of February 3d, 1865, in which they recognize the claim of the latter to deal with the property as their own, attorning to them, as it were.

On the 6th February, Gregg & Hughes wrote to Drakely & Fenton: "*We claim the whole of the property—the hams, pork, and shoulders—our receipts cover them.*" The extracts given in the statement of the case (*supra*, p. 244 to p. 252) show that Gregg & Hughes at this time made no distinction between the hams, and the pork, and shoulders; but set up the right to deal with all alike.

But the correspondence does not leave us merely to infer, from the ownership alone, that the hams were responsible for the advances made or for the general balance, when the final account sales of the whole was rendered.

The letter of February 9th, 1865, not only speaks of the hams and shoulders as in the same category, but refers to the letter of the 10th January, fixing the rate of advances, shown by R. McCabe to Gregg & Hughes, and it distinctly

informs Gregg & Hughes that a new rate must be adopted. In other words, the advances originally proposed, owing to the fall of prices, had turned out to be greater than should have been allowed; so that in determining now what was to be advanced hereafter, good margins on all the shipments were to be provided.

Now was the time for Gregg & Hughes to have made their present point, and to have said: "We cannot let the hams go in with the pork and shoulders, so as to give you a margin on all the shipments, for that would give you a lien for your general balance. This will never do. The hams were a separate transaction, and must be kept apart from the pork and shoulders. Deal with McCabe & Co. for the latter; but the hams are an especial consignment, to be accounted for by itself."

The letter in reply is dated February 11th, *and makes no comment* in this connection.

The next letter is dated February 22d—this too *is silent upon the subject.*

The next, dated February 27th, *instead of remonstrating* against Drakely & Fenton's views in regard to the liability of all the property, pork, shoulders, and hams, for the advances already made, expressly confirms it.   They say:

" *We hand you memorandum of property in your hands which our order covers, subject to two drafts made by McCabe & Co. on you with transportation and other regular charges.*"

On the memorandum inclosed *the hams are put.*

How, in the face of this letter, it can be contended, that the hams were not liable for the two drafts, along with all the other property consigned, is difficult to see.

The reason for the change in position, shown by Gregg & Hughes's correspondence *after* May 8th, is evident.   The letter of Drakely & Fenton of that date, reporting the net of all the consignments as not exceeding $10,000, when the net value of the hams alone was so much greater, on which but $10,000 had been advanced, showed the importance of separating the hams from the pork and shoulders, so that the shortcoming of the latter might not become a claim on

the proceeds of the former.    There would be reason for this change if in truth any distinction could be drawn between "our hams," and the "portions of McCabe & Co.," by which is meant the pork and shoulders.    But there was no such difference.    The origin of the title to all these pork products; the actual ownership, as proved by the warehouse receipts; the equitable ownership as security for advances—all were the same.    They were consigned by the same party to the same consignee, Drakely & Fenton.    The order of February 25th, directing the proceeds of all the pork products consigned, to be placed to the credit of Gregg & Hughes, made no distinction between "our hams, and other portions of McCabe & Co."    The previous and subsequent correspondence up to the 12th May made no such distinction.

The distinction is not borne out by the fact, and cannot therefore be regarded as having any existence whatever.

Regarding then, Gregg & Hughes as the owners, by the same title, of the pork, shoulders, and hams, we find them, after the pork and shoulders had been consigned without their consent, making no serious objection and receiving the proceeds of the advances; we find them also, after the consignment of the hams without their knowledge, insisting that the *whole of the property* was "virtually and legally" theirs, and taking from the consignors an order on Drakely & Fenton for the proceeds of *all the pork products consigned;* we find them declaring, in so many words, that the property which the order covered, including the hams now in dispute, was subject to the consignors' two drafts, the transportation and other regular charges, the liability now denied; we find them throughout controlling the disposition and management of all the property, and making no objections, when Drakely & Fenton referred to the *whole* as a security for the advances, leaving them to suppose, if they had ever doubted on the subject, that this was a thing of course; we find them, in a word, acting in the premises as though the relation of factor and principal as to all the consignments, had been established between the plaintiffs in error and themselves, until the fall in prices and the indifferent condition of much of

the property made it probable that the pork and shoulders would not cover the advances.

Surely upon this case there was evidence, if not proving, at least tending to prove our defence, that after the hams were received by Drakely & Fenton, Gregg & Hughes, with entire knowledge of the agreement between McCabe & Co., and Drakely & Fenton, and its partial performance, ratified and adopted it.

If the evidence but *tended* to prove this case, the court below erred.

As respects the oral testimony of Hughes, it may be said so far as a want of legal precision is suggested in the letter of the 27th February, that it is the legal precision used which frees the case from all doubt. Nothing can well be imagined clearer with regard to what the drafts covered than the expression of that letter.

*Messrs. S. T. Wallis and J. H. Thomas, contra:*

The hams being confessedly the property of Gregg & Hughes, could not cease to be theirs, or become subject to a lien in favor of any one else, except by some contract of their own, founded upon a legally adequate consideration, of which there is no pretence.

McCabe had entered into no obligation to ship the hams to cover possible deficiencies which might arise from advances made on the other meats. The advance on each was specific, the bill of lading always accompanying the draft to show on what it was drawn. Even as against him, Drakely & Fenton had no claim on the hams till in their possession, and he might have diverted the consignment after it was made. If, however, the arrangement between him and these last had been different, Gregg & Hughes only acquiesced in the shipment of the other meats and the imposition of a lien thereupon by him. They reserved their property in the hams, and right to ship them in their own names, and so notified to Drakely & Fenton.

If McCabe had been under an obligation to ship the hams, and Gregg & Hughes had been bound by it, they would

have been entitled to the corresponding benefits of the contract—to the advance of $40 per tierce on the 983 tierces, to $39,323, which is more than the amount they now claim out of them. If they had meant to subordinate their rights to that agreement, they could have got from him drafts to that amount, which the appellants would have been bound to accept. But they never asked for more than $25,000, and the appellants refused to advance even that.

Gregg & Hughes claimed the hams as their own, claimed none of the benefits, admitted none of the liabilities arising from the contract between McCabe and the other side, except as to the shipment of the pork and shoulders, and the lien imposed on them. They waived no title to the hams, but reserved the right to deal with them as their own property.

Their receiving a portion of the proceeds of the drafts drawn on the pork and shoulders, did not affect their right to the hams. It was received, under an agreement with McCabe, that the hams were to continue their own, be shipped by them in their own names, on their own account, and they so wrote to Drakely & Fenton, before the hams went into their possession.

The taking by Gregg & Hughes of the order for the proceeds of pork and shoulders, and the assignment of the bill of lading for the hams, did not impair the right they already had to the hams. They do not claim title under those papers.

The expression used in the letter of the 27th of February, cannot have the effect of subjecting the hams to a lien, or rendering the proceeds of them liable to a deduction for the drafts which had been drawn on the pork and shoulders, in view of all the facts. Even if Gregg & Hughes had meant, and had expressly promised to pay these drafts themselves, or make their hams liable for them, such a promise would have been void for want of consideration. The other side, as acceptors, were bound to pay them to us, and we, if compelled, as indorsers, to pay them to any one else, might have recovered them from the former. It was a debt due by Mc-

Cabe to Drakely & Fenton, for which our clients were in no way liable, and a promise by them to pay it, or make their property responsible for it, was a promise to answer for the default of another, *nudum pactum*, and void, under the Statute of Frauds.* Admissions are useful to determine doubtful questions, not to take away or qualify clear rights. They must be deliberate, " not fished out of loose expressions in mercantile correspondence."†

Gregg & Hughes might have replevied the hams from the railroad company, before they reached Drakely & Fenton, or from these afterwards, on tendering the freight and charges on them specifically. The amount which Drakely & Fenton would have been compelled to tender before replevying them, is still the test as to the character and amount of liability to which they were then subject.

If the hams had never been shipped, the loss arising from deficiency of the other meats, to cover advances made on them, would have fallen on the other side, not on us. Nothing in the case justifies the transfer of the loss to us. The other side, having exhausted their security, seek now to exhaust that of our clients, who are creditors of McCabe, and losers by him to a much larger amount than they.

Although factors have a lien upon goods actually in their hands, or the proceeds of them for a general balance, it is only for a balance due by the principal, against whom it is sought to be asserted.

All the facts assumed in the court's instructions were admitted, and the court, construing the letters between the parties, according to their proper and legal effect and force, was right, in substantially saying to the jury, that they contained no sufficient agreement, whereby the appellants had acquired the right to charge the property of the appellees for advances made on other property, to McCabe, and not to the appellees.

---

* Gist *v.* Cockey, 7 Harris & Johnson, 140; Robinson *v.* Marshall, 11 Maryland, 253, 4; Northern Central R. R. Co. *v.* Prentiss, Ib. 123, 27; Sumwalt *v.* Ridgely, 20 Id. 107.

† Cumberland Coal & Iron Co. *v.* Sherman, 20 Ib. 149.

The appellant's prayers were properly rejected, because they all fell short of the law of the case. They assumed, that if the jury could establish the relation of principal and factor, between the appellants and appellees, as to all the consignments, a lien upon all would follow as matter of law and matter of course, without reference to the circumstances under which that relation was created, or the intention of the parties who entered into it. This theory and assumption are untenable.

The lien of factors for a general balance is an implication of law, and, therefore, never arises where there is a special arrangement, or the circumstances rebut such implication. Special circumstances indeed always control it.*

The doctrine of lien applies only where the deposit of the goods is in the nature of a pledge, and does not apply where it is made for a special purpose.†

Nor does any lien arise for antecedent debts of the principal, by reason of the subsequent creation of the relation of principal and factor.‡

The property on which the lien is sought to be fixed must not only belong to the party from whom the debt is due to the factor, but it must come to his hands as the agent of that party.§

And where the factor is not acting in the capacity of general factor, but only in regard to a special consignment or adventure, he has no lien for a general balance.‖

These well-recognized principles are conclusive, *à fortiori*, where the effort is, as here, to establish a lien against one principal, for advances made to another, by a sort of process analogous to *merger* at common law.

*Reply.*—The argument of the other side—and such was

---

* In re Leith, 1 Privy Council Appeals, 305; Young *v.* Bank of Bengal, 38 E. C. L. R. 633, 4 (1 Deacon, 622); Neponset Bank *v.* Leland, 5 Metcalf, 262; Randel *v.* Brown, 2 Howard, 425.

† Walker *v.* Birch, 6 Term, 262, 3.

‡ Houghton *v.* Matthews, 3 Bosanquet & Puller, 488, 9.

§ Bruce *v.* Wait, 3 Meeson & Welsby, 15.

‖ De Wolf *v.* Howland, 2 Paine, 364, 5.

the view taken in the court below, is, that admitting the construction put by us on the letter of the 27th, there was no consideration for the responsibility insisted on.

Now there are two answers to this.

Looking at the letter of the 27th February, and seeing that, in terms, the hams were made responsible, along with the pork.and shoulders, for the $59,000 already advanced—Drakely & Fenton, on the 2d March, acknowledging the receipt of the letter of the 27th February, whose contents they say they have carefully noted, consent to make a further advance, and subsequently do actually advance the further sum of $10,000. This is a sufficient consideration.

But there is a second answer.

The letter of the 27th February is not a single fact in the case, containing a promise, so to speak, for which there was no consideration, but one of a series of facts, going to show that Gregg & Hughes recognized the acts of McCabe & Co. up to that time, and assumed and continued all the obligations of their relations to Drakely & Fenton. Some of these facts are to be found in the admissions of the letter of the 20th January, others in subsequent letters, already commented on; and the letter of the 27th February is but a recognition of a state of things, *not created by it, but existing previously*, the proof of which it facilitates, and that is all. It is an admission of a fact that was susceptible of proof, less absolute, perhaps, but sufficient for all that, without it.

References to the letters of Gregg & Hughes of March 8th, 15th; to Drakely & Fenton's letter of March 20th; and again to Gregg & Hughes's letter of April 25th, corroborate the views taken by us of their relations to all their property in question.

Recollecting that but $10,000 had been advanced on the hams, which, under unfavorable circumstances, produced $37,694.76, it is impossible to read this last letter and believe that, when it was written, Gregg & Hughes believed that the hams were a separate transaction, or that they were not liable for the general balance on final account, embracing all the consignments. The whole tone of the letter cor-

roborates the view taken by us in the relations between them and the other side touching all the consignments.

Mr. Justice DAVIS delivered the opinion of the court.

The correctness of the charge of the court to the jury, and the refusal of the court to charge as requested, present the only questions in this case which we are required to consider.

The plaintiffs in error, who were the defendants below, insist that they are injured by the action of the court in not allowing their defence to go to the jury. Their position is, that the evidence in the case proved their defence, or, at least, tended to prove it; and if it did, it was the province of the jury, and not of the court, to say what effect should be given to it.

It is not denied, that in the dealings between McCabe & Co. and Drakely & Fenton, there existed the relation of principal and factor, and that if Gregg & Hugnes had not intervened, Drakely & Fenton would have had a lien on the surplus, after all the consignments were closed up, for their general balance. The question then arises, whether this relation was changed by the intervention of Gregg & Hughes? The defendants in error contend that it was, so far as the shipment of hams was concerned, because they were received as the property of Gregg & Hughes, after notice that it was their property; on the contrary, the plaintiffs in error insist that the relation of principal and factor was unchanged as to all the shipments, for the reason that Gregg & Hughes, after the receipt of the hams by Drakely & Fenton, put themselves in the place of McCabe & Co. in regard to the whole transaction, adopted what had been done in reference to each shipment, and claimed to be the owners of all the property, and did direct and control the disposition of it. The case was tried substantially on this issue.

There is no dispute that the warehouse receipts gave to Gregg & Hughes the legal title to all the property described in them; and if so, it necessarily follows that McCabe & Co. could not lawfully contract with Drakely & Fenton to receive

and sell this property without the consent of Gregg & Hughes. There is no doubt if this consent had been obtained in advance of the making of the contract, that Gregg & Hughes would have been bound by it, and could not free themselves from any of the obligations which rested on McCabe & Co. to discharge.

But as this consent was not obtained before the movement of the property commenced, the important inquiry is, whether the consignment of hams is separable from the preceding consignments, and whether the loss on the pork and shoulders must be borne by Drakely & Fenton, or by Gregg & Hughes. This must depend on the terms on which the hams were received, and these terms need not be embodied in the form of a written agreement, but can be gathered from the correspondence and conduct of the parties. If the case stood alone, on the naked fact that notice of title was given while the hams were *in transitu*, there would be no difficulty. But it is claimed that Gregg & Hughes adopted McCabe & Co.'s contract throughout; substituted themselves in their place as to all the consignments—pork, shoulders, and hams—and continued in their own name, the relation of principal and factor, before existing between McCabe & Co. and Drakely & Fenton. If this were so, the case would be equally free from difficulty; for, if Gregg & Hughes were not bound by a contract which McCabe & Co. had entered into with reference to their property, they could elect, after being informed of the nature of the contract, to reject it or adopt it. If, with a full knowledge of the facts concerning it, they ratify it, they thereby make themselves a party to it, as much so as if the original agreement had been made with them. And if they ratified it, no new or additional consideration was required to support the ratification, because in adopting the contract, they accepted with it the original consideration on which it was founded, as a sufficient consideration for their adoption of it.

With this general statement of the principles of law applicable to the controversy, we are met with the inquiry, whether there is any evidence in the case to support the

theory of the plaintiffs in error, that Gregg & Hughes intended to, and did, adopt the contract of McCabe & Co. with them. It is not enough that Drakely & Fenton should have so understood the agreement, but the proof must also show that Gregg & Hughes had a similar understanding of it, and manifested their intention to be bound by it.

The evidence in the case, to which no exception was taken, consists of a voluminous commercial correspondence, and some parol proof, explanatory of the conduct of the parties. The correspondence covers many pages of the record, and there is a marked difference in its tone and bearing after it had progressed for several months. It would be difficult to discuss the evidence in reference to the theory advanced by the plaintiffs in error, without indicating, in a greater or less degree, our views as to the effect that should be given to it. If the case is to be tried again, it is not proper to do this, for in that event it is the province of the learned court and the jury to determine the effect of the evidence.

The only question with which we have to deal at the present time is, whether the evidence in this record *tended* to prove the position assumed by the plaintiffs in error; for if it did, the learned court should either have submitted the evidence on this point to the consideration of the jury, or if, in the opinion of the court, there were no material extraneous facts bearing on this question, and the contract relied on must be determined by the commercial correspondence alone, then to have interpreted this correspondence and informed the jury whether or not it proved the contract to be of the character contended for by the plaintiffs in error.*

We have examined the record in this case carefully, and are of the opinion that there was evidence at the trial which tended to prove that, after the hams were received by Drakely & Fenton, Gregg & Hughes, with full knowledge of the agreement between McCabe & Co. and Drakely & Fenton, and its partial performance, ratified and adopted it.

---

* Turner *v.* Yates, 16 Howard, 23

Whether the evidence actually proves this ratification and adoption, we express no opinion.   It is enough, as we have seen, for the purposes of this writ of error, that it tended to prove it.

As the learned court below submitted the case to the jury, on the single issue of legal title to the hams in Gregg & Hughes, and notice of that title to Drakely & Fenton, it follows that the judgment of the Circuit Court should be reversed, and a

VENIRE DE NOVO AWARDED.