AMERICAN MORTG. CO. OF SCOTLAND, Limited, v. OWENS et al.

(Circuit Court, D. South Carolina. November 23, 1894.)

HUSBAND AND WIFE—SEPARATE ESTATE.

O. applied to D. for a loan, saying that he wanted the money, and wished to get a loan upon his wife's estate. D, having made out the application for the loan in her name, O. asked if he could sign it, and, upon D.'s telling him that he could, signed it with his wife's name. O. afterwards told his wife, who had known nothing of it, of his application for a loan, and induced her to agree to sign the papers when prepared, but did not tell her the contents of the application, or of any use proposed to be made of the money. O.'s wife, under D.'s direction, signed, without reading, a note and mortgage upon property belonging to her, and D. thereupon, in the wife's presence, but without any request from her, gave O. a check to his own order for the proceeds of the loan. *Held*, that the loan was made to O. for his own use, upon the security of

his wife's note and mortgage, and under the law of South Carolina as existing in 1886, where a married woman could only contract in reference to her separate estate, such note and mortgage were void.

This was a suit by the American Mortgage Company of Scotland, Limited, against Missouri A. Owens and Raymond Owens, her husband, for the foreclosure of a mortgage. The cause was heard on the pleadings and proofs.

John T. Sloan, Jr., and Allen J. Green, for complainant.
J. J. Brown, St. J. Grimke, and C. B. Northrop, for defendants.

SIMONTON, Circuit Judge. This is a bill to foreclose a mortgage given by a married woman of her separate property. The mortgage bears date 12th March, 1886. The first question which meets us in the case is, was this a valid mortgage, she being a married woman? In South Carolina, at the date of the mortgage, a married woman was under disability; perhaps it would be more exact to say "had but a limited power to contract." Savings Inst. v. Luhn, 34 S. C. 186, 13 S. E. 357. She could only contract with reference to her separate estate. Questions upon this subject have for many years vexed the supreme court of South Carolina. As a result of their discussion, the supreme court in Mortgage Co. v. Deas, 35 S. C. 50, 14 S. E. 486, reaffirm Savings Inst. v. Luhn, 34 S. C. 184, 13 S. E. 357, and say:

"It must be regarded as settled that when a married woman, either directly or through her agent, borrows money from another, the money so borrowed becomes at once a part of her separate estate, and her contract to repay the same is a contract with reference to her separate estate, which may be enforced against her, and that the lender, in the absence of proof to the contrary, has the right to assume that the money was borrowed for the use of the married woman, and she is estopped from denying that fact unless it is shown that the lender had notice to the contrary."

The Luhn Case adds that the husband may, if so authorized by the wife, act as her agent, and the disposition of the money after it is borrowed cannot affect the question. Savings Inst. v. Luhn, 34 S. C. 184, 13 S. E. 357.

The question in the case is, was this money borrowed by the married woman, and was the contract a contract as to her separate estate? The evidence as to the borrowing of the money is this: Mrs. Missouri A. Owens, the defendant, owned a farm in Barnwell county. Her husband, Raymond Owens, lived on the farm with her, and had no other property. He managed the farming, and the place supported itself. W. H. Duncan, a lawyer of Barnwell Court House, had advertised that he could furnish loans of money. Raymond Owens, without the knowledge of his wife, visited Duncan, and said that he wished to get a loan on his wife's estate, and asked Duncan if he could do it. Duncan replied that he could, and offered to make out the application for him. The application was made out in the name of the wife, and Owens asked Duncan if he could sign it. Duncan replying that he could, Owens signed his wife's

name, ,without more. The evidence at this point is important, and will be quoted literally (Owens is being examined):

"Q. Did you tell Col. Duncan how you came to borrow the money? A. No. I told him I wanted the money. Q. Did you say you wanted it for your own use and purpose? A. I told him I wanted the money. Q. You did not tell him your wife wanted the money? A. No."

Duncan sent on the application to New York. In this application it was stated that some of the money would be used in putting up a ginhouse on the farm. Some time after the application was made, and before the papers were prepared for signature, Owens told his wife, who up to that time knew nothing whatever of a proposed loan, that he had made an application for money, but he did not say for what purpose, and asked her to sign the papers when they should be prepared. After refusing more than once, she consented. When the papers were prepared, Duncan met Mrs. Owens, and, without saying anything about the papers, put them before her, and told her where and what to sign. She did so. Nothing passed between them. The husband was there at the time, and when all the papers were executed Duncan gave a check to the husband for the face of the bond, less 20 per cent. commissions and some smaller charges for papers and recording and insurance. The check was made payable to the order of the husband, although she was either present or within reach. Mrs. Owens says that she never saw it, and that no part of the money was spent on her property.

These are all the facts about the borrowing. As Mrs. Owens was a married woman, with a limited power to contract, a person dealing with her must take notice of her disability, and when he seeks to enforce this contract the burden is upon him to show that it is one a married woman is capable of making. He must show that she had the power to make the contract. To do this he must show that the money was borrowed for her use. If it were, she would be liable. If not, she would not be liable, even though she expressly declared her intention to bind her separate estate in the obligation given to secure the repayment of the money borrowed, for the simple reason that in the latter case she had no power to make such a contract, and her intention to do that which she had no power to do is wholly insufficient to bind her legally. ' Savings Inst. v. Luhn, supra. Who, then, borrowed this money? The husband acted. Did he act as his wife's agent? Did Duncan deal with him as such, believing or having reason to believe, that Mrs. Owens was the principal, that she was the borrower, that the money was borrowed for her use, and that her husband was only the agent? Owens told him that he wanted the money, and that he wanted the loan on his wife's estate. He did not say that his wife wanted it, nor did he say that it was for her use, nor that his wife authorized him to borrow it. When Duncan prepared the application, Owens asked him if he could sign it. He did not profess to have authority from his wife to sign it. Apparently, the question meant, being her husband, "Have I a right to sign for my wife?" Duncan seemed to think that he could. Now the husband is never qua husband the agent of his wife. Such agency is never pre-

sumed. It must be proved, and must be proved like every other fact. Merely signing his wife's name does not prove that he was the agent, especially when he signed it under the advice of Duncan.

This application was a contract,—the foundation of the loan. So far, there is nothing to show that it was Mrs. Owens' contract. Did she subsequently ratify it or affirm it, or, if not, is she estopped from denying that it is her contract? In order to prove that she ratified or confirmed the act of her husband, it must be shown that she had full knowledge of the facts concerning it. Drakely v. Gregg, 8 Wall. 267. And in order to estop her it must be shown that she held out her husband to the world as her agent, or that in this transaction she had put him in possession of all the indicia of authority to act for her as her agent.

The next step in the evidence is that the husband informed the wife that he had made an application for the loan. But she did not see the application, or know its contents, for her husband did not tell her its purpose. She knew nothing of the statement that any part of it was to be used in putting up a ginhouse, nor does it appear that she knew that it was signed in her name, or for her. When the bond and mortgage were signed, Duncan saw her for the first time. He knew that she had limited power to contract. He knew that her separate property was being incumbered, and that this could not be done unless she was the borrower, and that it (the money) was borrowed for her use; and yet he said not one word to her to ascertain if this was the case, or if she knew what was being done. Apparently, he preferred to rely on her estoppel. Having thus procured the signature of the papers, Duncan gave the check to the husband, to his order, not as agent, but as if its contents were his own. It is worthy of note that the money was paid eo instanti upon the execution of the papers by Duncan on his own check. If it was his own money, advanced by him for the lender, then when the lender repaid him the lender ratified and adopted his act, constituting him quoad hoc the lender's agent. If he had in hand the money of the lender, then that money was paid to him upon the strength of the application, and because of the application. In any event, if the bond and mortgage were void in initio because of want of power in the married woman to make them, and so went into Duncan's hands, no bona fides in any subsequent lender can give them validity.

Thus we see that in its first steps this money was borrowed by the husband on the security of his wife's property, he having no express or implied power or authority to do so, and Duncan having no reason to believe that he had such authority. On the contrary, having been put on the inquiry, on his guard, the husband asked him "Can I sign the application?" The question implied doubt of his authority. So, at the end of the transaction, the wife being at hand, immediately after the interview with her, upon her signature of the papers which now are set up to estop her, Duncan paid the money to the husband in a check to his own or-

der, the very act appropriating the money to the husband, and not to her use. It is impossible to escape the conclusion that this loan was made to Raymond Owens for his own use upon the security of his wife's note and mortgage, and that both Duncan and Owens so understood it,—that it was a contract which, as the law of South Carolina then stood, Mrs. Owens had not the power to make, and that it is utterly void. The bill must be dismissed.