## HATCH v. FERGUSON et al.

(Circuit Court of Appeals, Ninth Circuit. February 25, 1895.)

### No. 164.

1. RATIFICATION—ESTOPPEL—UNAUTHORIZED CONVEYANCE.

One H., a white man, and his wife, J., an ignorant and inexperienced Indian woman, were seised of 160 acres of land acquired under a preemption claim, and had also partially completed the residence required to secure another 160 acres under the homestead laws. H. began proceedings to commute for the price, and buy the homestead before completing his residence, but died before the proceedings were completed. J. renewed the proceedings, and completed the same. While they were pending, J. gave to one F., the executor of her husband, a power of attorney to sell her lands. Before the issue of the patent to J., F., under her power of attorney, sold all her interest in both tracts to one H. for a price per acre which was equal to the value at the time, but was paid only for one-half the number of acres in each tract; F. and H. then supposing J. owned no more, and intending to deal only as to that quantity. J., before the execution of the power of attorney, had intended to sell the land. She knew of the sale, received the proceeds, and used the same in the purchase of other property, and, without objection, allowed a purchaser from H. to make extensive improvements on the property, greatly enhancing its value. J. afterwards sought to set aside the sale on the ground that the power of attorney was obtained by F. through misrepresentation and fraud, and that she did not intend to sell the land. *Held*, that as to the one-half interest in each tract intended to be conveyed by the deed made by F., as J.'s attorney, to H., the sale was ratified, and J. estopped to dispute the same, whether or not she had power, at the time the sale was made, before the issue of the patent for the homestead land, to convey the same, and whether or not the power of attorney was obtained from her by F. through misrepresentation and fraud.

2. PRINCIPAL AND AGENT—REVOCATION OF AUTHORITY—REFORMATION OF DEED.

Some time after the sale to H., F. learned that J. was entitled to the whole of the homestead tract, and asked and received from H. payment for the half thereof not paid for when the deed was given. The weight of evidence showed that this did not occur till after J.'s suit to set aside the deed was commenced, to which both F. and H. were parties. *Held*, that the commencement of the suit having revoked F.'s authority, whatever it was, payment for the land at this time gave no rights to H., and J. might have had the deed reformed to agree with the agreement between F. and H. at the time of the sale.

3. BONA FIDE PURCHASER—NOTICE—OFFICER OF CORPORATION.

H. conveyed the whole homestead tract and the half of the pre-emption tract to one N. It was not clear whether H., in making the purchase from F., had or had not acted as agent for N. N. sold the land to the E. Co., a corporation, of which H. was president. The negotiations for this purchase of the land were wholly conducted by other officers of the E. Co., and the bargain was agreed upon at a meeting of the executive committee having charge of the matter for the company, at which H. was not

present. *Held*, that the E. Co. was not chargeable with H.'s notice of the infirmity of the title to the second half of the homestead tract, and, as a bona fide purchaser thereof for value, was entitled to hold the same.

Appeal from the Circuit Court of the United States for the District of Washington.

This was a suit by Josephine Hatch against E. C. Ferguson, Henry Hewitt, Jr., and the Everett Land Company, to set aside a conveyance. The circuit court rendered a decree for the defendants. 57 Fed. 959. Complainant appeals.

A. D. Warner and James Hamilton Lewis, for appellant.

Brown & Brownell, for appellees.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge. Josephine Hatch, an Indian woman, and a citizen of Oregon, brought a suit against the appellees to set aside her conveyance of lands in the state of Washington. The complainant is the widow of Ezra Hatch, who was a citizen of the state of Washington, and who died on July 8, 1890. At the time of his death, Ezra Hatch had acquired title, under the pre-emption laws of the United States, to 160 acres in Snohomish county, state of Washington, which land may herein be designated as the "pre-emption claim." He had also resided four years upon a certain other 160-acre tract in the same county, which he had entered under the homestead law of the United States. Just prior to his death he contemplated selling his homestead claim, and in order to do so he had arranged to commute, and pay the government price therefor, rather than continue his residence another year, and acquire title under the homestead laws. His advertisement for that purpose was made, but upon the day set for taking final proof he died. He left a will devising all his interest in his two claims to his children. After his death his widow published her advertisement to commute the homestead claim, and upon the 19th day of September, 1890, made her proofs, as required by section 2301, Rev. St. U. S. On the following day she executed to the defendant Ferguson, who was the executor and guardian of the minor children, under the will of Ezra Hatch, a power of attorney authorizing him to sell her lands in the state of Washington. Final certificate was issued to her upon her payment of the commutation money, on the 26th day of September, 1890, and on the 29th day of November, 1891, patent to the homestead was issued. On the 21st day of October, 1890, Ferguson, under the power of attorney so given him by the widow, executed to the defendant Hewitt a deed of her interest in both the pre-emption and the homestead claims. It was then supposed that Josephine Hatch owned an undivided one-half interest, or a community interest, in both claims, and the sale was made upon the basis of $25 per acre, which, for 160 acres, amounted to $4,000. Hewitt paid Ferguson $2,000 in cash, and gave a mortgage upon both claims to secure a like sum. It was afterwards ascertained that the widow owned all of the homestead claim, which made

the number of her acres, conveyed by her, 240 instead of 160. After this fact was discovered, and after the commencement of this suit, Hewitt paid Ferguson $2,000 more, for the other 80 acres in the homestead claim, which was covered by the conveyance. The complainant alleged that the power of attorney to Ferguson was procured, and the conveyance to Hewitt was made, pursuant to a fraudulent conspiracy between Ferguson and Hewitt to defraud the complainant of her land; that she was ignorant of the English language, and that she was told by Ferguson at the time of signing the power of attorney that the same was a bond of friendship only, and that she did not intend to sell her land; and that the price at which the same was sold was grossly inadequate. The circuit court, after hearing the proofs, dismissed the bill.

It is contended on the appeal that the complainant was grossly deceived in signing the power of attorney, and that the same was void; that the complainant could not lawfully sell her homestead claim before the issuance of the final receipt; that the power of attorney to Ferguson was void for the further reason that it was made before the receipt was issued; that the terms of the power of attorney were not such as to authorize the sale of after-acquired land; that on the date of the execution of the power she had no interest in the homestead which could be conveyed; and that the power of attorney, being obtained by fraud, is a forgery, and could not be the basis of a conveyance of title, even to a bona fide purchaser.

The view we take of the evidence renders the discussion of these questions unnecessary. At the time of the death of Ezra Hatch the homestead claim was unimproved. The logging timber had been cut and removed, but the land was uncleared. It was situate upon a peninsula lying between the Snohomish river and Puget Sound. Its value at that time was probably no more than $1,500,—the price at which it is said Ezra Hatch had offered it for sale. By the time of the sale to Hewitt, the latter had begun to purchase other lands in that vicinity with a view to acquiring or controlling all the land in the peninsula, and forming a land company and building a city. As the plan progressed the values rose, from the fact of his purchases. The price paid to Mrs. Hatch is not shown to have been inadequate at the date of her sale. The testimony is voluminous and conflicting concerning the execution of the power of attorney, and the circumstances attending the same. Upon the part of the complainant and her witnesses, the testimony is that the defendant Ferguson sent for the complainant to come to his office, where he had a power of attorney prepared, ready for execution; that he had a conversation with her there in the Chinook language, in which he told her that the paper was an instrument in the nature of a bond of friendship; and that she executed the same, not knowing that it was a power of attorney; that she abandoned the land soon after, because directed to do so by Ferguson, whom she knew to be her husband's executor and her children's guardian, and who, as she thought, had

power to direct her movements; that although she removed to some distance, to a little town called "Marysville," where lots were purchased for her, and a house was built for her residence, she did so at the instance of Ferguson, and took no part in the purchase of the lots or the improvements thereon, or the furniture that was procured for her use; and that the land sold by her, instead of being of the value of $25 per acre, was worth several times that amount. Upon the part of the defendants, there is testimony that the power of attorney was fully explained to the complainant by Ferguson at the time it was signed, and that the notary public who took the acknowledgment of the same inquired of the complainant's daughter, a young woman who was within a few days of coming of age, whether her mother understood the instrument, and was answered that she did, and who further testified that he understood the Chinook language sufficiently to know what was said by Ferguson to the complainant at that time, and that he heard him explain to her the nature of the instrument.

If the case were to rest solely upon the evidence of what occurred at the time of signing the power of attorney, there might, perhaps, be proof sufficient to authorize the court to rescind the conveyance; but the case so made by the complainant is met by strong proof that prior to that date she had intended to sell the property, and that subsequent to that date she had received the proceeds, with full knowledge of the terms of the sale, and had herself used the proceeds in the purchase of other property, and had for a period of 18 months acquiesced in the sale, and stood by while the Everett Land Company (to whom Hewitt had transferred the property by mesne conveyances) made extensive and costly improvements upon the lands they had acquired upon the peninsula, whereby the value of the land that she had sold became very greatly enhanced. The proof that she had intended to sell the land prior to the meeting with Ferguson is afforded in the fact that almost immediately after her husband's death, and before she had had any conference whatever with Ferguson concerning the sale of the land, she advertised to commute the homestead upon which she and the children were residing, and to pay therefor the price of $1.25 per acre, rather than acquire title by residing thereon another year, and in the fact that she had no money wherewith to pay the commutation price, but expected to borrow the same until she should have sold her land. There is also direct evidence that she declared her intention to sell the land. She admits that shortly after the conveyance she removed from the homestead to Marysville, and that prior to that time Ferguson had informed her of the sale. She admits that she made no objection to the sale, or to the terms thereof. The testimony proves conclusively that it was her choice to reside at Marysville; that she selected lots there, and negotiated for their purchase, and authorized Ferguson to pay $600 for the same; that she approved the plans for a house, and authorized a neighbor to contract for its construction upon the lots; that Ferguson paid therefor out of the proceeds; that she selected furniture for the house, and requested Ferguson to pay for the same; that

she received money from Ferguson at different times, and finally, in March, 1891, she negotiated for and purchased a 40-acre tract of land with the remainder of the $4,000 which was the consideration for her deed to Hewitt. It was not until the commencement of this suit, about 17 months after the sale, that she expressed to the defendants her dissatisfaction therewith, and complained that she had not received enough for her land. In the meanwhile the Everett Land Company had expended large sums of money upon this and other lands they had purchased in the same vicinity, and the value of that tract had become largely enhanced thereby, so that when this suit was begun, in March, 1892, the complainant alleged in her bill that the value of the land in controversy was $5,000 per acre. These facts clearly amount to a ratification of the conveyance to Hewitt. The law applicable to the case, as expressed by Chancellor Kent, is as follows:

"There is no principle better established in this court, nor one founded on more solid considerations of equity and public utility, than that which declares that if one man knowingly, though he does it passively, by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his own claim, he shall not afterwards be permitted to exercise his legal right against such person." Wendell v. Van Rensselaer, 1 Johns. Ch. 354.

The same doctrine has been expressed in the decisions of the supreme court of the United States. Bank v. Lee, 13 Pet. 107; Drakely v. Gregg, 8 Wall. 242; Morgan v. Railroad Co., 96 U. S. 716; Smith v. Sheely, 12 Wall. 358; Bronson v. Chappell, Id. 681. In the case last cited the court said:

"Where one, without objection, suffers another to do acts which proceed upon the ground of authority from him, or, by his conduct, adopts and sanctions such acts after they are done, he will be bound, although no previous authority exists, in all respects as if the requisite power had been given in the most formal manner. If he has justified the belief of a third party that the person assuming to be his agent was authorized to do what was done, it is no answer for him to say that no authority had been given, or that it did not reach so far, and that the third party had acted upon a mistaken conclusion."

The complainant, it is true, was an ignorant woman, and was unable to speak or understand the English language; but that fact, while it may lead the court to more carefully scrutinize the evidence upon which her ratification is said to be based, does not dispense with the observance of the rule of law applicable to all persons, whether ignorant or not,—that their acts in accepting the proceeds of a transaction such as this, and acquiescing in the same, are tantamount to a ratification thereof, and estop them from questioning its validity, as against third parties who have acted upon the faith thereof. The complainant is not to be classed among weak-minded persons. She was not so ignorant as not to understand the nature of a sale of real estate. She knew enough about her rights to advertise for the commutation of her homestead. She undoubtedly understood what had been done when Ferguson notified her of the sale to Hewitt. She knew that she must seek a home elsewhere, and that her attorney held in his hands the proceeds of the sale of her lands. She called upon him for those proceeds, and used the same in the purchase of other prop-

erty. It is difficult to conceive of a ratification more complete. She is thereby estopped to question the validity of the title of the Everett Land Company to all the land that was intended to be conveyed in the deed to Hewitt. But there was other land conveyed. Her deed to Hewitt, while it contains no precise description of the extent of the grantor's interest in the land, conveys all her right, title, and interest in the two claims. Ferguson and Hewitt conducted all the negotiations concerning the sale, and they are the only witnesses as to what it was the intention to convey. They both say that the agreement was that Mrs. Hatch's interest in the two claims should be sold to Hewitt for a consideration of $25 an acre, and that it was understood between them both that the quantity of that interest was 80 acres in each tract, or, in other words, that she owned a half interest in each claim. Ferguson says:

"My understanding was that Mrs. Hatch had an undivided one-half interest in each of these claims. I was not aware of anything to the contrary until the partition sale."

Hewitt says:

"We supposed at the time that she had a half interest in both claims." "We concluded that her interest was a half interest only, and, at $25 an acre. that would make $4,000." "I thought I was buying half of each claim."

He also testified, it is true, that it was his understanding that he was to pay $25 per acre for Mrs. Hatch's interest, whatever that interest might be; but the possession of this understanding, if such he had, upon his part, cannot overcome the force of his direct testimony, and that of Ferguson, as to what interest it was the intention to convey. It thus appears that the transaction was made with reference to one-half of each claim, and no more. Ferguson says that subsequently he was led to make inquiry concerning the amount of the interest which Mrs. Hatch had in the homestead claim, from the fact that the partition suit brought by Hewitt against the minor heirs of Ezra Hatch on April 7, 1891, referred solely to the pre-emption claim, and did not include the homestead. He then, for the first time, learned that Mrs. Hatch, at the time of the sale, had owned the whole of the homestead, and that the deed made by him had conveyed the whole thereof to Hewitt. He says that he then demanded from Hewitt $2,000 more, as consideration for the extra 80 acres, but that Hewitt made no response to his demand, and never paid the same until after the commencement of this suit, in March, 1892. Hewitt testifies that he discovered, at some time after his purchase from Mrs. Hatch, that she had owned the whole of the homestead, instead of the half, as he had supposed, and that the deed to him conveyed the whole of that claim. He said nothing to Ferguson in regard to the matter, but he says that Ferguson discovered it at about the time of the partition suit, and that Ferguson never asked for the remainder of the money until about the time it was paid, which was a month after the commencement of this suit, and that the reason that he did not pay it sooner was that he was hard up, and needed the money. Under this state of facts, the question arises, what were the

rights of the respective parties at the time the deed from Mrs. Hatch to Hewitt was delivered? Although that deed, in terms, conveyed all her interest in the homestead claim, it was clearly the intention of the parties to the transfer to convey only one-half thereof. Their bargain was for one-half, and the purchase price of one-half only was contracted to be paid and was paid. The conveyance of the whole interest was an error, the correction of which could have been compelled by the grantor, so as to conform to the intention of the parties. The minds of the contracting parties had not met upon a bargain by which the whole claim was to pass. Neither Mrs. Hatch nor Ferguson, her agent, could have compelled Hewitt to pay for the land so conveyed to him in excess of that which he had bargained for. There was no obligation upon the part of Hewitt to pay the extra $2,000, nor upon the part of Ferguson to receive the same. In equity, Mrs. Hatch was still the owner of one-half of the homestead. Were the subsequent dealings between the parties such as to consummate the sale of the other 80 acres, so that Mrs. Hatch may be said to have parted with her right and title in and to the same? At the commencement of the suit, from the nature of the allegations which were contained in the bill of complaint, there was clearly a revocation of the power of attorney that had been given to Ferguson. He had no right after that date to convey the lands of the complainant, or in any way to bind her. The Everett Land Company and Hewitt, both being parties defendant to the suit, and charged with notice of such matters as were therein alleged, were thereby notified of the attitude in which the complainant stood to Ferguson, and knew that Ferguson had no further right to act for her. The payment, therefore, of the $2,000, after the commencement of this suit, by Hewitt to Ferguson, and its acceptance and retention by the latter, have no bearing upon the determination of the question. Its decision must depend upon the acts done after the delivery of the deed from Mrs. Hatch to Hewitt, and before the commencement of this suit. There is nothing to show that between those dates there was an agreement or understanding between Ferguson and Hewitt whereby the deed to the homestead claim was to stand for the whole of Mrs. Hatch's interest therein, or the grantee in the conveyance was to pay for the 80 acres which had been unintentionally conveyed to him. The whole of the evidence concerning their dealings consists in the testimony of Hewitt that as early as the 30th day of December, 1890, when he conveyed the whole of the homestead claim to Norton by warranty deed, he had discovered the error, but that he made no mention thereof to Ferguson, and had no conversation with him concerning the matter until the latter demanded the payment of the $2,000, at or about the time the same was paid, and the testimony of Ferguson that after the commencement of the partition suit, which was the 7th day of April, 1891, he discovered that Mrs. Hatch had owned the whole of the homestead claim, instead of the one-half, as had been supposed, and that he demanded payment of an additional $2,000 from Hewitt upon that account.

What answer was made to such demand is not disclosed in the evidence, and the fact of the demand is denied by Hewitt, who says that Ferguson never asked for the other money until the time when it was paid. Mrs. Hatch, presumably, knew nothing of her rights in the homestead claim, nor of the extent of her interest therein, except such information as was given her by her agent. There is no evidence that he ever told her of his discovery that she had owned the whole instead of the half of the homestead claim, or that he had demanded the payment of the additional $2,000 from Hewitt.

The question then arises whether the Everett Land Company acquired title to this property as an innocent purchaser, without notice of the equities remaining in Mrs. Hatch. There is some dispute in the testimony as to whether or not Hewitt, in making the purchase from Mrs. Hatch, acted for himself or for his brother-in-law, Norton. The weight of the evidence is that he purchased for the latter. If he bought for himself, however, and subsequently sold to Norton, the latter acquired title to the whole claim, as an innocent purchaser, for there is no evidence that he knew anything of the antecedent circumstances. Having thus acquired the title, Norton could convey his interest to any one, and his vendee would be unaffected by notice. If, on the other hand, Hewitt purchased as the agent of Norton, the latter was chargeable with the knowledge possessed by his agent; and the question whether the Everett Land Company purchased as an innocent purchaser depends upon the effect to be given to the fact that Hewitt, the president of that company, had, from his participation therein actual knowledge of all the circumstances attending the purchase from the complainant. The Everett Land Company was incorporated on the 19th day of November, 1890, and Henry Hewitt was its president during the whole period covered by the transactions in question. The evidence shows, however, that he took no part in the negotiations leading up to the sale from Norton to the corporation. The negotiations were between Norton and one Weymiss, who was the general manager of the corporation, and a member of its executive committee. The decision to purchase the property for the corporation was made by the executive committee, or the members thereof that were resident in New York. Hewitt was at that time in Tacoma. Norton stated his terms to Weymiss, and after some negotiations a telegram was sent him from New York, signed, "Everett Land Company, Executive Committee," accepting the terms that he had offered. The committee instructed Hewitt to attend to the transfer and the payment of the purchase money. It does not appear that Hewitt participated, either as a member of the board of directors or as a member of the executive committee, in arriving at the conclusion to make the purchase. While there are cases holding that knowledge of a fact acquired by a single director is in no case notice to the corporation, unless (1) it is actually communicated to the board as a body, or (2) it has been acquired by the officer while acting officially in the business of the company, other

cases, and perhaps with the weight of authority, hold that where a director, having such knowledge, acts as a member of the board, upon the matter affected by the information, the corporation will be bound, whether such knowledge was acquired privately, or in the course of the business of the corporation. In Bank v. Campbell, 4 Humph. 395, the court held that, where a party had several agents, notice to one is notice to the principal, where the one having notice is engaged in the transaction; and, since every director of a bank is its agent, notice to one director, in a transaction in which he acts as one of the board, is notice to the bank, although the notice may not have been communicated to him in relation to the particular transaction in which he is about to act. In Craigie v. Hadley, 99 N. Y. 131, 1 N. E. 537, the court said:

"The general rule is well established that notice to an agent of a bank or other corporation, intrusted with the management of its business or of a particular branch of its business, is notice to the corporation in transactions conducted by said agent, acting for the corporation, within the scope of his authority, whether the knowledge of such agent was acquired in the course of the particular dealing, or on some prior occasion."

In Bank v. Cushman, 121 Mass. 490, the court said:

"If the note is discounted by a bank, the mere fact that one of the directors knew the fraud or illegality would not prevent the bank from recovering; but if the director who has such knowledge acts for the bank, in discounting the note, his act is the act of the bank, and the bank is affected with his knowledge. A bank or other corporation can act only through its officers or other agents. As in other cases of agencies, notice to the agent, in the course of the transaction in which he is acting for his principal, of facts affecting the nature and character of the transaction, is constructive notice to the principal."

Of similar import are Terrell v. Bank, 12 Ala. 506; Bank v. Davis, 2 Hill, 464; Bank v. Campbell, 4 Humph. 394; Bank v. Payne, 25 Conn. 444; Foundry v. Dart, 26 Conn. 376.

The purchase by the Everett Land Company not only comes within the exceptions to the general rule that are recognized in the foregoing decisions, but it is embraced in the further exception, equally well established, that, where the officer who has the knowledge has also such connection with or interest in the subject-matter of the transaction as to raise the presumption that he would not communicate the fact in controversy, there is no imputation of notice to the corporation. Innerarity v. Bank, 139 Mass. 332, 1 N. E. 282; Frenkel v. Hudson, 82 Ala. 158, 2 South. 758; Bank v. Gifford, 47 Iowa, 575; Wickersham v. Zinc Co., 18 Kan. 481. Hewitt had conveyed the land to Norton with covenants of general warranty. He was liable as warrantor for any defect in the title. The circumstances—the sale and warranty to Norton, the fact that the latter was his brother-in-law—were sufficient to inform the corporation that Hewitt's interests in this transaction might run counter to those of the corporation; and it would appear that the other directors of the company recognized this fact, since they took into their own hands the negotiations with Norton, and only called upon Hewitt to carry out the bargain they had made. The Everett Land Company is therefore the innocent purchaser of all the land which the complainant conveyed to Hewitt. The decree is affirmed, with costs to the appellees.