### CURTICE v. CRAWFORD COUNTY BANK et al.

(Circuit Court, W. D. Arkansas. September 20, 1901.)

1. BANKS—STATUTORY LIEN ON STOCK—PRIORITY BETWEEN BANK AND PLEDGEE.

A stockholder in a bank may pledge his stock as collateral security to a third person by a written assignment and delivery notwithstanding a statute requiring transfers to be made on the books of the bank, and the lien of such pledgee, acquired before the stockholder becomes indebted to the bank, will prevail over a statutory lien given the bank to secure its debt, where the bank before or at the time its debt was contracted had notice of the pledge; but, in the absence of such notice, the lien of the bank is superior, and the burden of proving notice rests upon the pledgee.

2. SAME—NOTICE OF LIEN.

A pledgee of bank stock is chargeable with notice of a statutory lien on such stock in favor of the bank for an indebtedness from the stockholder to the bank existing when the pledge is made.

3. EVIDENCE—TESTIMONY OF PARTY—CONSIDERATIONS AFFECTING WEIGHT.

Although a party to a suit is permitted by statute to testify in his own behalf, the considerations which excluded his testimony at common law still exist, and may properly be considered as affecting the weight to which it is entitled, especially where his right to recover as a plaintiff depends solely on his own testimony in regard to transactions with persons since deceased, through whom, as officers and agents of a defendant corporation, he seeks to charge such defendant with notice.

4. BANKS—REPRESENTATION BY OFFICER—KNOWLEDGE OF CASHIER AS NOTICE TO BANK.

The cashier of a bank, in pledging stock of the bank, owned by him, as security for a personal debt, acts in his individual capacity, and not as an officer of the bank; and his knowledge of the transaction is not attributable to the bank to affect the validity of its statutory lien on the stock as security for a loan subsequently made him.

5. SAME—NOTICE TO PRESIDENT.

Notice that a stockholder in a bank has pledged his stock to a third person, acquired by the president, who has no part in the active management of the bank's business, and who is not at the time acting in its behalf, is not notice to the bank which will affect its statutory lien on such stock for a loan subsequently made to the stockholder without the president's knowledge.

In Equity. Suit to enforce lien on bank stock pledged as collateral security.

Miles & Miles and Scarrit, Griffith & Jones, for complainant.

Reid & McDonough and Jesse Turner, Jr., for respondent Crawford County Bank.

E. B. Pierce, in pro. per.

ROGERS, District Judge. The controlling inquiry in this case is whether the plaintiff, J. M. Curtice, has a first lien on the stock of Robert S. Hynes in the Crawford County Bank, it being evidenced by stock certificates numbered 108 and 133. Both certificates were issued to defendant Hynes. He was cashier of the bank when certificate 108 was issued, but had ceased to be cashier when certificate 133 was issued. Certificate 108 was issued June 16, 1891, and was for 200 shares of $25 each,—$5,000; certificate 133 was issued March 15, 1894, for 40 shares of $25 each, or $1,000. Plaintiff claims a lien on said stock by way of pledge as collateral for a loan to defendant Hynes, evidenced by note bearing date March 15, 1894, for $8,400, and on which is now due something over $6,000. This note, it is alleged, was a renewal note for money, a part ($2,000) loaned Hynes in the spring of 1888, and a part ($3,000) in the spring of 1889, and subsequently renewed annually until principal and interest amounted to $8,400; and that the stock certificates represented other certificates anterior in date, which had been taken up and canceled, and these issued in their stead. The bank, on the other hand, claims a statutory lien (Sand. & H. Dig. Ark. § 1342) on the same stock to secure advances made to Hynes after he ceased to be cashier, in the fall and winter of 1893 and 1894, as well as for some small loans made to him anterior thereto. The question is, which has the prior lien?

Section 1342 of Sand. & H. Dig. Ark. reads:

"The stock of every such corporation shall be deemed personal property, and be transferred only on the books of such corporation in such form as the directors shall prescribe; and such corporation shall at all times have a lien upon all the stock or property of its members invested therein for all debts due from them to such corporation."

This statute has been construed by the supreme court of Arkansas in two cases (Springfield Wagon Co. v. Bank of Batesville, 57 S. W. 257; Oliphint v. Bank, 60 Ark. 198, 29 S. W. 460), but the precise question here presented was not determined in these cases. The consensus of judicial opinion on the construction of statutes substantially the same as this establishes the following principles of law: (1) The bank has a statutory lien on the stock of a stockholder the moment he becomes indebted to the bank. (2) As between a stockholder in a bank and a third person, the former may, by assignment in writing and delivery, pledge his stock to such third person as collateral security without regard to the provisions of the statute regulating the transfers of stock. (3) The lien of such a pledgee, acquired before the stockholder becomes indebted to the bank, will prevail over the lien of the bank, provided the bank had notice of the pledgee's lien before or when its debt was

contracted; contra, if the bank had no notice. (4) A third party accepting the stock of a stockholder in pledge for his indebtedness must be held to have notice of the lien of the bank on the stock for all then existing indebtedness of the stockholder to the bank. (5) In a contest by a pledgee asserting a lien on the stock of the bank against the bank claiming a lien on the stock for the stockholder's indebtedness to the bank, the burden is on the pledgee to show notice to the bank of the existence of his lien before or at the time the indebtedness to the bank was created. In support of these principles, I cite: Masury v. Bank, 35 C. C. A. 476, 93 Fed. 603; Lowell, Stocks, § 175; Conant v. Reed, 1 Ohio St. 298; Birmingham Trust & Sav. Co. v. Louisiana Nat. Bank (Ala.) 13 South. 112, 20 L. R. A. 600; Bank v. Laird, 2 Wheat. 390, 4 L. Ed. 269; Hammond v. Hastings, 134 U. S. 401, 10 Sup. Ct. 727, 33 L. Ed. 960; 1 Cook, Stock & S. § 533; Gemmell v. Davis (Md.) 23 Atl. 1034. Many other authorities might be cited bearing upon and illustrating the principles of law above stated. It is believed, however, these principles are established by the great weight of judicial opinion, and I do not understand either or any of them are controverted by the learned counsel on either side of this case. Moreover, there seems to be no controversy as to the validity of the indebtedness of the defendant Hynes to both Curtice and the bank. It follows, therefore, from an examination of this record, that, if the bank had no notice at the time its indebtedness was created that Hynes had previously pledged the stock in controversy to Curtice (assuming such to be the case), its statutory lien must prevail over that created by the pledgee to Curtice. As to whether the bank had such notice on this record is perhaps a mixed question of law and fact. So far as the plaintiff's case on the facts, as it relates to notice, is concerned, it depends solely on his own evidence as to alleged interviews between himself and defendant Hynes and Judge Jesse Turner, Sr., both of whom died before this suit was begun. In weighing the testimony of a party to a suit, there are some elementary principles which should not be passed over lightly. They rest upon long experience, and until a comparatively recent date received the sanction of the best and wisest minds. In 1 Greenl. Ev. § 326, the author says:

"It [the common law] rejects the testimony (1) of parties; (2) of persons deficient in understanding; (3) of persons insensible to the obligations of an oath; and (4) of persons whose pecuniary interest is directly involved in the matter in issue,—not because they may not sometimes speak the truth, but because it would ordinarily be unsafe to rely on their testimony."

Such was the law in this country in all the courts, state and federal, until within the memory of some of us. In 1864 congress passed this statute (section 858):

"In the courts of the United States no witness shall be excluded in any action on account of color, or in any civil action because he is a party interested in the issue tried: provided, that in actions by or against executors, administrators, or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other, as to any transactions with, or statement by, the testator, intestate or ward, unless called to testify thereto by the opposite party, or required to testify

thereto by the court. In all other respects the laws of the state in which the court is held shall be the rules of decision as to the competency of witnesses in the courts of the United States in trials at common law, and in equity and admiralty."

Schedule, section 2, Const. Ark. 1874, provides:

"In civil actions no witness shall be excluded because he is a party to the suit or interested in the issue to be tried. Provided, that in actions by or against executors, administrators or guardians, in which judgment may be rendered for or against them, neither party shall be allowed to testify against the other as to any transactions with or statements of the testator, intestate or ward, unless called to testify thereto by the opposite party. Provided, further, that this section may be amended or repealed by the General Assembly."

The right of parties to a suit to testify had been previously conferred by the Arkansas Code of 1869, now incorporated in Sand. & H. Dig. §§ 2915, 2916. By section 2917, Sand. & H. Dig., it is provided:

"All other objections to witnesses [referring to persons made incompetent by the previous sections, but not including parties] shall go to their credit alone, and be weighed by the jury or tribunal to which their evidence is offered."

I call attention to these statutes merely that we may know the inroads on the common law, and get at the present status of the law in this state. But if it was not "ordinarily safe" to rely on the testimony of a party to a suit simply because he was a party, and that only, how much more unsafe is it when his right to recover depends solely upon his narration of what took place between himself and other persons who are no longer alive? In that event all restraint, except that of conscience, is removed, because there are none to question; and the temptation to deceive, to suppress, to prevaricate, is not held in check by the fear of contradiction or exposure, and immunity from the penalty of false swearing is made practically sure. Nor must it be forgotten that the removal of the barrier which disqualified a party to a suit to testify at all does not add anything to his credibility, or remove any temptation previously existing to deviate from the truth. It is just as unsafe after the disqualification is removed to rely upon the testimony as it was before, the only difference being that the court or jury trying the case is required to pass upon the credibility of the party. No doubt, in many cases the ends of justice have been subserved by permitting parties to a suit to testify. The statutes removing the bar as to parties to a suit becoming witnesses was a recognition of the harshness of the common-law rule; but those who are called upon to witness the administration of justice in the courts can scarcely have escaped the suspicion that the fountains of justice have not been purified thereby. The legislatures have recognized this danger by forbidding a party to a suit in cases where the opposite party is an executor, administrator, or guardian, and wherein judgments may be rendered for or against them, to testify as to transactions with or statements of the testator, intestate, or ward, unless called to testify by the opposite party. The reason which underlies statutes of that character is equally applicable to the case at bar. The only difference is, neither the congress nor the

110 F.—53

legislature of this state has extended the principle to a deceased agent, although it has been done in many other states, as will be seen by an examination of the text and cases cited thereunder in 29 Am. & Eng. Enc. Law (1st Ed.) tit. "Witnesses," p. 715 et seq. Under the statutes quoted above, the evidence of the plaintiff as to personal transactions between himself and Hynes cannot be considered, because as to such transactions he is not a competent witness against the administrator of Hynes; nor would such evidence be binding on the bank. The reason is that, when an agent comes in possession of information while engaged in a transaction of his own, with which his principal has nothing to do, and in which his principal has no interest, such knowledge is not binding upon his principal; and especially is this true if the transaction in which the agent is engaged is of a nature hostile to the interests of his principal. If it be true that plaintiff is not a competent witness, in a suit against the administrator of Hynes, as to transactions between himself and Hynes in the lifetime of the latter, which transactions were personal to themselves, then the inquiry is, when did plaintiff come into the possession of either of the certificates in controversy as collateral for the loan made to Hynes? No lien could attach to the stock in the absence of the possession of the certificate, unless it may be, as some authorities say, by some instrument of writing creating a lien. There was no such writing in this case. The lien, therefore, could only attach by possession of the certificate. The stock itself, while declared by the statute to be personal property, is incapable of delivery, because intangible, existing only in contemplation of law; and the certificates are not stock, but, like deeds to land, are the evidence only of title. The only evidence except that of plaintiff relating to the transfer of this stock is found in the face of Hynes' note to Curtice. That note bears date March 15, 1894, and recites on its face, "I hereby deposit with said Curtice, as collateral security for the payment thereof, 340 shares of the capital stock of the Crawford Co. Bank of Van Buren, Ark., being certificates 106, 108, and 133," and then gives said Curtice the power to sell, etc. In the absence of other proof, the deposit of the stock must be held to have occurred on that date to secure that note. Now, let us see if the testimony of plaintiff can be allowed to vary that conclusion. Curtice testifies in substance as follows: That in the spring of 1888 he made two loans at the same time,—one for $2,000 to Hynes personally, one for $3,000 to the defendant bank,—and took as collateral security for both loans certificates for about $5,000 of Hynes' stock in the defendant bank; that he took a note of Hynes for the $2,000 loaned him, and the loan to the bank was evidenced by a time certificate of deposit drawing 8 per cent. interest, and running for one year; that Hynes, who was cashier of the defendant bank, and himself were in the new bank building of the defendant bank, behind the cashier's desk, discussing the loan; that an agreement was reached as to the terms of the $2,000 loaned to Hynes personally, but the terms as to the bank's loan were left open, and Hynes said he would step out and see Judge Turner about whether the bank wanted the $3,000; that he (Curtice) followed Hynes to the room

in the rear end of the building, called the "directors' room," and there found Judge Turner alone, sitting at his desk; that the purpose of Mr. Hynes going there was to see if Judge Turner advocated the bank taking the loan, but he gives no reason why he followed Hynes, although the question was put to him. He says Hynes' conversation with Judge Turner about the loan "was a little to the side," and he did not hear it. On being called upon to give a "photographic" account of what occurred in that interview, he answered:

"I simply remember that Mr. Turner, Sr., asked the question—I don't know how it came up—why I wanted to take bank stock as collateral, and he said bank stock would not be good unless the certificate of deposit was good; that they were both on the same firm; and it struck me that it was a point well taken, and I remember it, for it looked unbusinesslike for me to take bank stock for the debt of the bank; and Mr. Hynes spoke up, and said, 'Curtice will not loan anything without collateral.' I only remember that from its being out of the usual order. Mr. Jesse Turner's criticism was so appropriate that it has lived in my memory."

Curtice says about a year after this transaction the bank paid its $3,000 indebtedness, but Hynes at the same time borrowed a like sum from him, and, taking up his $2,000 note, executed his own note for about $5,000, and left the bank stock with him as collateral; that he does not know the numbers or amounts of these certificates of stock, but they were indorsed "Robert S. Hynes" in blank, and Hynes said they were the first certificates of stock he ever owned. It is beyond dispute that the new bank building in which Curtice says this transaction occurred was not then in existence, and was not for nearly two years thereafter. This conversation and transaction could not, therefore, have taken place in that building in the spring of 1888. Did it take place in that building at all? The admitted—or at least established—facts preclude the possibility of it. Curtice, according to his own statement, never made any other loan to the bank but that one, and it was paid off, as shown by him, about a year later. This payment was made before the new bank building had been constructed. But, if such were not true, the predicate for any such conversation passed away when the first loan was made. The purpose, says Curtice, of interviewing Judge Turner was to see if he advocated the bank taking the loan; and if the loan was made in the spring of 1888 and no other loan was ever made to the bank, there was no occasion afterwards for any such interview, either in that building or in any other building. Curtice assigned no other purpose for the interview than to ascertain whether or not Judge Turner advocated the bank accepting the loan. Moreover, the purpose for which this interview was had was a matter purely of bank policy, and entirely within the province of Hynes, and entirely beyond the established course of action of Judge Turner. It is shown that Hynes, without consultation with any of the officers of the bank, was accustomed to exercise at all times the power of receiving deposits, whether they bore interest or not; and that it was agreed, when Judge Turner became interested in the bank and accepted its presidency, that he should not be annoyed with the details of the bank, and that in point of fact he never was; that his real connection with the bank

was to preside over its directors' and stockholders' meetings, and to sign such documents as the president of the bank, by the nature of his office, was required to execute; and this is shown to have been done wholly, if not always, at the instance of his son and law partner, Jesse Turner, Jr., who was an active director and a member of its board of discount or executive committee. It is shown, too, that there never was a desk in the directors' room at any time, and that Judge Turner was never known by the present cashier, Mr. Pernot, who has been a trusted employé in the bank since it was founded, or by his son, or by Mr. Moore, also a director and a member of the executive committee of the bank, to be in that room at any time except at stockholders' or directors' meetings. He is not shown to have ever transacted any other bank business there, or to have had anything to do with the details or daily transactions of the business of the bank. His name and character was what the bank wanted and got, and not his active services. His age forbade the latter. The statement of Curtice, in the absence of a knowledge of the powers and duties of Hynes and of Judge Turner, and of the habits and life of the latter, and his real relations with the bank, is plausible in some respects, while not so in others. An inexperienced cashier, exercising limited powers and discretion, might very well be supposed to consult the president of the bank, if convenient, but more properly the executive committee or board of directors, before taking deposits bearing interest at 8 per cent. Such a statement might well be considered consistent with business experience. But Hynes was not an inexperienced cashier. He founded the bank. He had the active management of it from its organization. He was, in fact, the manager of the bank, himself a large stockholder, consulting no one as to the general run of its business, but no doubt referring important loans and other matters to the executive committee or board of directors. He was never known to refer such a matter to Judge Turner. He knew Judge Turner had nothing to do with that part of the bank's business. Nor is it shown, either by practice or express authority, that Judge Turner was ever empowered to perform any such duty or exercise any such power, while it was the constant practice of Hynes; and it must be inferred that it was with the knowledge of the bank to do without consulting any one the very thing about which Curtice says he went to consult Judge Turner. Again, just why Curtice should have followed Hynes into a private room where Hynes had gone, with his knowledge, to consult Judge Turner upon a question of bank policy, viz. as to whether the bank should take the loan, and where the consultation, when had, as Curtice says, was a "little aside," where he did not hear it, is not clear, nor entirely consistent with common propriety or business experience. Just why Hynes himself, a borrower at that time, should of his own accord pledge his own bank stock to secure a loan for the bank, is out of the usual experience of business men, and no reason is given by Curtice why he did not call upon the bank for security, instead of Hynes personally. But, if Hynes chose to do that, it was a matter about which there was no occasion for consultation with Judge

Turner, as the bank could not have been injured by Hynes pledging his own bank stock to secure the loan to the bank. Nor does Curtice say that the interview was had in order to consult Judge Turner about the collateral, or about the question of the loan of Hynes. Turner had no concern in that. Nor does it appear that Judge Turner was advised at the time that Curtice had made a personal loan to Hynes. So that, on the whole, there is much more reason to say that, if the statement of Curtice is not incredible and unreasonable, it is at least out of the ordinary course of conduct and inconsistent with business experience. To this it may be added that the stock book shows that in the spring of 1888, when Curtice says this loan was made, Hynes had only one certificate for $10,000, and two smaller certificates, in the aggregate amounting to $2,750. Indeed, the stock book shows that the first time Hynes owned stock certificates which, either singly or any two or more of which in the aggregate, approximated $5,000, was in February, 1890, when he had issued to him certificate numbered 65, for 400 shares ($10,-000), No. 66, for 160 shares ($4,000), and No. 67, for 40 shares, ($1,000), the last two certificates aggregating $5,000, which is the sum Curtice claimed was pledged to him as collateral in the spring of 1888. Those certificates were issued to Hynes about a year after the bank had paid Curtice the $3,000 loan made in the spring of 1888, and also about a year after Hynes had renewed his loan, and increased it to $5,000. Curtice also stated that the certificates of shares which he held as collateral were indorsed to him in blank, but the stock book and the agreed statement of facts both show that no stock certificates ever issued to Hynes were signed in blank by him except No. 124, for 160 shares, issued on the 20th of September, 1892, and the stock certificates numbered 106, 108, and 133, neither of which had been issued in February, 1890. So that it is quite clear that neither of certificates 65, 66, nor 67 was ever pledged to Curtice. It may be noted here that it was in February, 1890, that the bank stock was increased from $50,000 to $90,000. It is also absolutely certain, from the facts stated, that Curtice did not hold $5,000 of Hynes' stock either in 1888 or 1889, for the reasons that Hynes had no certificates approximating $5,000 in amount during these years, and those he did hold were never assigned, in blank or otherwise. It is useless to consider this branch of the subject further. In the opinion of the court the interview testified to by Curtice as having taken place in the spring of 1888 in the directors' room of the new bank building did not occur at that time, or at any other time; and, if the transaction itself occurred between himself and Hynes, the evidence wholly fails to show that any one except Curtice and Hynes knew of it before or up to the death of Hynes. If they knew of it, the testimony of Curtice to that effect would not be competent to bind the administrator of Hynes, nor was Hynes' knowledge binding on the bank. I also conclude that if Curtice's testimony is true in this that the stock he held was assigned to him by Hynes in blank (and for the purposes of this case his testimony in that regard must be taken as true), that he never held any stock up to July 15, 1891, for no stock of Hynes issued

prior to that date was ever assigned in blank at any time, and the stock canceled itself so shows, and it is so agreed in the stipulation filed.

But the plaintiff claims that in 1890 or 1891 he had another interview with Judge Turner, in which he imparted notice to Judge Turner of Hynes' indebtedness to him, and that he held the bank stock of Hynes as collateral. He says it occurred in this way: The bank, he says, had increased its capital stock, and Hynes had written to him to send in the old certificates he held, and get new ones for them; and later, when he was in Van Buren, Hynes requested him to return the old certificates, and get new ones. On being asked, "Was that the time at which this certificate 108 was issued?" he answered: "I think the capital stock was increased the year before the date of issue of certificate number 108. My impression is the change was made in 1890; and this certificate was probably issued and delivered to him a year later, when the note became due again, as I usually took the notes from year to year; sometimes 14 months." He then says, in substance, that he does not remember the circumstances under which certificate No. 108 was issued to him, or who was present when it was done, but "I do remember an instance when all the certificates I held were taken up on account of change in the bank's capital, and new certificates being issued by the corporation. When I was in Van Buren, Mr. Hynes told me, as he had written me, that he would like to take up the certificates, and issue new ones, and requested me to come to the bank, and he would issue new certificates. What deeply impressed this transaction on my mind was that when he opened the stock book of the bank I saw that Jesse Turner, Sr., had signed the certificates, as president, in blank, and I thought it an unusual proceeding. From the blanks so signed, he filled out a certificate for me. Question. Who did? Answer. Capt. R. S. Hynes, and signed it himself as cashier." "Later," he says, "I was at Jesse Turner's office—Jesse Turner, Sr. I went to him as president of the bank, desiring him to see the stock issued to me, from the fact that it was just a little suspicious about the stock of the bank being filled out over his signature in blank; and I asked Jesse Turner, Sr., what he thought the stock was worth, and told him that they had been issued by Capt. Robert S. Hynes as collateral for his indebtedness to me; and he said he thought they were worth par. My real object was in getting him to see stock filled out over his signature." Curtice says the blanks had been filled out at that time, and stock delivered to him as security; that he does not know that the certificate referred to was No. 108, but that he had about $7,500 of stock at that time, and that Judge Turner was then president of the bank. He then says certificate 133 was not issued to him until March 15, 1894, which is the date the note now in controversy was executed, and that stock certificate 133 was intended to cover accrued interest then due on a former note, of which the present note is a renewal; and then details the circumstances under which certificate 133 was given to him. On cross-examination, plaintiff, when asked to state when it was he took the certificates above referred to up to Judge Turner,

and had the conversation about their value, and was asked how many certificates he then had, answered that he did not remember how many certificates he had; that the interview occurred either in the fall or summer of 1890, or, if in 1891, "in the early part of the summer, or before the month of July"; that no one was present when he went to Judge Turner's office, and he found him sitting near his desk; that he then held more than one certificate, but does not know whether he held over two. He also says that he surrendered certificate 106, for $2,500, on July 17, 1895. This was before Hynes' death. Certificate No. 133, not having been issued until after the bank's debt was created, is eliminated from further consideration. This leaves certificate No. 108, for 200 shares,—$5,000,—in issue. That certificate was not issued until July 16, 1891. It could not have been the certificate he presented to Judge Turner, because Curtice says his interview with Judge Turner took place in the fall or summer of 1890, or before July, 1891, and certificate 108 had no existence at either of these dates. On February 15, 1890, the capital stock of the bank was increased to $90,000. On September 9, 1890, all the old stock which Hynes held was called in, and the new certificates issued to him in lieu thereof were as follows: Certificate No. 65, 400 shares, $10,000; certificate No. 66, 160 shares, $4,000; certificate No. 67, 40 shares, $1,000; and it could not have been this stock that Curtice showed to Judge Turner, for three reasons, either of which is conclusive: (1) The stock which Curtice says he held was all assigned to him in blank, but none of these certificates were ever assigned at any time by Hynes. (2) Curtice says he held at the time of the interview with Turner two certificates aggregating about $7,500. Certificate No. 67, for 40 shares, was assigned by Hynes to W. T. Morgan, as shown by the bank books, on January 10, 1891. There were only two certificates remaining, Nos. 65 and 66, and they aggregated $15,000, whereas Curtice said he held at that time two certificates aggregating only about $7,500, or perhaps they may have been $200 or $300, more or less. (3) These certificates were issued September 9, 1890, and in lieu of all other stock held by Hynes. Curtice says his interview with Turner was a short time after the stock was issued,—perhaps a week; that he took it up to Turner, and asked him what it was worth, his real object being, not to ascertain its value, but to let Turner see the stock, which he says had been filled out by Hynes upon blanks purporting to have been previously signed by Turner, which transaction he thought was irregular; and that this interview took place in Turner's office over the bank. But Turner did not occupy the office over the bank until six weeks after that, or between the 25th of October or the 1st of November, 1890. It is certain, therefore, that certificates of stock 65, 66, and 67 were not shown by Curtice to Turner. But, if there were no certificates of Hynes then in existence, answering to the description of those he said he showed Judge Turner, and the irregularity of the certificates was the sole reason he had for going to see Judge Turner, it follows he did not have the interview at that time.

There are many other facts in this record, established by testimony which is not controverted, tending to show the falsity of the testimony of Curtice, and to which I have not adverted. No one can read his testimony, and compare it with the facts which appear on the face of the stock book, including the canceled stock attached thereto, and then compare it with the stipulation on file, and the testimony of Jesse Turner, Jr., and Mr. Pernot, without being impressed with the belief that many things testified to by him can have no foundation in fact. It may be observed, if the alleged interview with Judge Turner was in 1890, when Curtice says he saw the stock signed in blank by Judge Turner, then he certainly got all the stock of one date, for all the stock of Hynes was reissued September 9, 1890; and this stock, except 40 shares, assigned to Morgan in January, 1891, remained outstanding and unchanged in amount until called in in July, 1891, and during that period Hynes held no other stock. The certificates issued to Hynes after the stock of the bank was increased from $90,000 to $100,000, which increase occurred on the 15th of February, 1891, were as follows: Certificate No. 106, issued July 15, 1891, 100 shares, $2,500; certificate No. 107, issued July 15, 1891, 100 shares, $2,500; certificate No. 108, issued July 16, 1891, 200 shares, $5,000; certificate No. 124, issued September 20, 1891, 160 shares, $4,000. Curtice received as collateral of this issue certificates 106 and 108, as shown by Hynes' note now in controversy. I am satisfied, not only from Curtice's own evidence, but from facts appearing on the stock book, that he neither got these certificates at the time they were issued nor did he ever show them to Judge Turner. He was not in Van Buren in July, 1891, when they were issued. He says himself that the interview was before July, 1891; and, moreover, this stock was issued on different dates, while this transaction with Hynes about this stock, as he states, all occurred on the same day, and his interview with Judge Turner only a few days later. His debt, too, was for a larger amount than either of these certificates of stock. It was $2,500 more than the largest certificate of stock, and no reason is assigned why, if the stock had been signed by Turner in blank, and was being filled out in the place of old stock formerly held by him, he did not have one piece filled out to cover the entire debt, instead of having two pieces filled out, on different dates, for amounts neither of which approximated the debt. I think it clear, therefore, that the second interview to which Curtice testifies as having been had with Judge Turner is not shown to have occurred either in 1890 or 1891, and there is an absence of any evidence that the second interview was at a later period than July 1, 1891. I conclude, therefore, from the facts, that this stock was never pledged until the 14th day of September, 1894, the day on which Hynes executed the note for $8,400.

It is very difficult to see how the plaintiff could be mistaken, simply, in many of his statements which are overcome by the practically uncontroverted facts; and no more striking case can perhaps be found than this, indicating the care that should be given in considering the statements of a party with reference to interviews and transactions which he claims to have had with persons who are

dead. "Courts lend a very unwilling ear to the statements of what dead men had said." Lea v. Copper Co., 21 How. 504, 16 L. Ed. 207. But, suppose it were true that Turner had the interviews with plaintiff, as testified to by the latter. How would that affect the bank? As to Hynes, it is true that in the spring of 1888, when the original loans were made, if he pledged any stock, he knew it. But, so far as his personal loan and the pledge of his stock was concerned, it was not a bank transaction, nor was it within the province of his agency for the bank to pledge his own stock for a bank loan. He might have done that of his own accord, and, if he did, it was a very unusual transaction. And, if he did pledge his stock for a loan to himself as well as a loan to the bank, he was not acting for the bank in pledging his stock, for the bank had no authority or power to pledge his stock. The bank did not control or hold his stock; It had no lien upon it at that time, and, if it had, it could not have pledged it. If, therefore, he pledged his stock, it was his own act, and not that of the bank, and he was under no obligation to the bank to pledge it. He agreed to pledge it for his own loan before he ever saw Judge Turner, and when he did see him it was not about his personal loan or the stock, but to ascertain whether he favored the bank taking the $3,000 loan from Curtice. Nor was this a matter about which the president of the bank had anything to do. He had taken the presidency of the bank under an agreement that he should have nothing to do with its active management, and no one except Curtice ever knew him, so far as the proof shows, to have done a single act pertaining to the management or control of the details of the bank's business, except this one act, to which Curtice alone testifies. He was not a member of the executive committee, had nothing to do with taking deposits bearing interest, or making loans, or discounting paper, and it is not shown that he ever knew that Hynes ever owed the bank a dollar up to the day of his death. So far as Hynes' loan was concerned, it cannot be said to have been of any concern pro or con to the bank; but, if it was, it was an act unfriendly to it, for it might be the bank would prefer that a man exercising as much control as Hynes did over the bank's business should be as much identified pecuniarily with its welfare as possible. Hynes' loan and his pledge of stock therefore must be held to have been his personal transaction, and the information his own information, in no sense binding on the bank. I can but think that if he did pledge the stock as Curtice said it was purposely concealed from the bank, for it is almost incredible that the present cashier, Mr. Pernot, would not have known of it. He did not know it, and even after Hynes had pledged the stock by the note of September 14, 1894, he kept it from Pernot, and did not disclose the whereabouts of his stock when Pernot demanded it, and never did up to the day of his death. But even, if as stated, Turner and Hynes both knew that Hynes pledged the stock in 1888 to secure the bank loan of $3,000, that loan was paid in 1889, and presumably the stock released, for there is no evidence that Turner knew Hynes made a personal loan of $2,000 at the same time that the bank made its $3,000 loan. Assuming, therefore, that all Curtice says about the interview of 1888

to be true, I am of opinion it constituted no notice to the bank. The principle of law is that notice to an agent, to be binding on a corporation, must come to the agent while acting in the line of his duty, or within the scope of his agency, and relating to transactions in which the agent is engaged at the time for the corporation. The same principle applies to the second interview when Curtice says he showed Turner the stock, and inquired its value, and stated he held it as collateral for the debt of Hynes, not with the view of ascertaining its value, but, as he says, to let Turner see the stock in order that his own suspicion of its irregularity might be allayed. Turner was not then engaged in any duty of the bank. It was no part of his official business to tell Curtice the value of the bank stock, nor was he then or at any time a member of the executive committee or discount board, nor did he previously or subsequently take any part in extending credit to Hynes, or have any knowledge, so far as the proof shows, that the bank had extended credit to Hynes. Notice to him, therefore, that Hynes had pledged his stock, did not bind the bank.

Now, let us examine some of the authorities along these lines.

In Whitehead v. Wells, 29 Ark. 108, the court said:

"Whether Whitehead had actual notice or not,—which, from the evidence, the jury might well infer,—yet he is affected with notice of all his agent knew in the line of his duty or the scope of his powers."

In Manufacturing Co. v. Rogers, 65 Am. Dec. 604, the supreme court of Georgia, by Lumpkin, J., said:

"It should have been submitted to the jury to find, in the first place, whether or not the proof showed that Crockett acted as the agent of the company in making the contract. If so, then all he did and said in the execution of his agency was admissible evidence, and bound his principal; otherwise it should have been excluded from their consideration in making up their verdict."

In Bank v. Savery, 82 N. Y. 307, Leonard was a director of the plaintiff bank. As a member of his firm, he had received notice that the note in controversy was affected by fraud. When the note became the property of the bank, it was insisted that notice to Leonard was notice to the bank. The court said:

"If the knowledge of the director was acquired in his official capacity, the bank also is presumed to have it; but, if it was acquired as any private person might have acquired it, the bank is not chargeable. Leonard comes within the latter condition. The information which he had was not communicated to him as a director, no. did he acquire it while engaged in its business. It did not belong to the plaintiff, and there can be no presumption that it was communicated to it. In behalf of the bank he did no act concerning the note or its purchase. The title to the note was perfect in the bank when its president perfected the bargain. Relying on that, the money of the bank was paid. His knowledge, therefore, cannot operate to its prejudice."

In Bank v. Clark (N. Y. App.) 34 N. E. 909, the court said:

"An officer's knowledge, derived as an individual, and not while acting officially for the bank, cannot operate to the prejudice of the latter. Bank v. Davis, 2 Hill, 451. * * * The rule may be stated generally to be that, where a director or an officer has knowledge of material facts respecting a proposed transaction, which his relations to it, as representing the bank, have given him, then, as it becomes his official duty to communicate that knowl-

edge to the bank, he will be presumed to have done so, and his knowledge then will be imputed to the bank."

In Cragie v. Hadley, 99 N. Y. 131, 1 N. E. 537, 52 Am. Rep. 9, the court said:

"The general rule is well established that notice to an agent of a bank or other corporation, intrusted with the management of its business, or of a particular branch of its business, is notice to the corporation in transactions conducted by said agent, acting for the corporation, within the scope of his authority, whether the knowledge of such agent was acquired in the course of the particular dealing or on some prior occasion."

In Bank v. Cushman, 121 Mass. 490, the court said:

"If the note is discounted by a bank, the mere fact that one of the directors knew the fraud or illegality would not prevent the bank from recovering; but if the director who has such knowledge acts for the bank in discounting the note, his act is the act of the bank, and the bank is affected with his knowledge. A bank or other corporation can act only through its officers or other agents. As in other cases of agencies, notice to the agent, in the course of the transaction in which he is acting for his principal, of facts affecting the nature and character of the transaction, is constructive notice to the principal."

See Hatch v. Ferguson, 66 Fed. 676.

In Victor Gold & Silver Min. Co. v. National Bank of Republic, 49 Pac. 828, the supreme court of Utah held:

"The agent cannot act for himself and his principal as to anything with respect to which their interests may vary. The reason is that self-interest may prevent him from the performance of the duties he owes his principal. 4 Thomp. Corp. §§ 4630, 4657, 4658; Claflin v. Bank, 25 N. Y. 293; Bank v. Gifford, 47 Iowa, 575. When the officer is acting partly for himself and partly for the corporation, a notice to him does not affect the corporation. In section 4657, Thomp. Corp., the rule is stated: 'But it should be borne constantly in mind that the cases where a notice to the president or any officer of a corporation will affect the corporation are cases where such president or officer is acting exclusively for the corporation. In cases where they are acting partly for the corporation and partly for themselves, a notice to them does not affect the corporation, because the fact that their personal interest is opposed to that of the corporation may induce them to withhold the information thus communicated from the directors, or from the appropriate corporate officer. In receiving a communication under such circumstances the president or other officer is held not to represent the corporation, but to represent himself only.' "

In Exchange Nat. Bank of Spokane v. Bank of Little Rock, 7 C. C. A. 111, 58 Fed. 140, 22 L. R. A. 686, the Bank of Little Rock provided a clerk, whose duty it was to prepare exchange for the cashier's signature. This clerk drew a draft for $25 to his own order, and procured the cashier's signature thereto, pretending that he wished to make a remittance of that amount. He raised the order to $2,500, and discounted it. It was held by the court that the Bank of Little Rock was not liable on the draft, assigning as a reason that when the forgery occurred the clerk was not acting for the bank, but acting for himself, and because the purchase of the draft was complete, he being the owner of it when the forgery was committed. This case illustrates in the strongest light the principle that, in order to bind the bank, the agent must, at the time the notice comes to him, be acting for the bank.

In Bank v. Sneed (Tenn. Sup.) 36 S. W. 716, the supreme court of Tennessee held that:

"A bank will not be charged with notice of the insanity of an accommodation indorser on a renewal note accepted by it because at that time the president of the bank, who was a member of the discount committee which passed on the note, knew of such insanity, he not having been present with the committee when the new note was taken and the old note extinguished, and not having had knowledge of the transaction till the day after it was consummated."

"Notice to the president of a bank by the maker of a note that it was procured by fraud, and without consideration, and will not be paid, is not notice to the bank, and will not make it liable for subsequently discounting the note, when such notice was not given to the president in his official capacity, nor at the bank, nor with any reference to the bank's business." Bank v. Pierce (Wash.) 33 Pac. 972, 36 Am. St. Rep. 174.

In Gemmell v. Davis (Md.) 23 Atl. 1032, a contest arose between the North Branch Company, of which Brydon was president, and Davis & Co., as first pledgee, and Mrs. Brydon, as second pledgee, over dividends on Brydon's stock, which had been pledged to the parties above stated; and it was insisted in that case that Brydon, being the president of the North Branch Company, and having assigned his stock, the company had knowledge thereof. The court of appeals of Maryland said:

"Though Brydon, who was the president of the North Branch Company, knew of the transfer to Davis & Co. and to Mrs. Brydon, because he made them, his knowledge thus acquired was not binding on the company, he not then being engaged in the business of the company, and not acting in his capacity of president."

It appeared in Mathis v. Pridham (Tex. Civ. App.) 20 S. W. 1015, 1016, 1024, that:

"The president of a bank which was a creditor of the corporation had been informed by the promoters of the corporation, who were trying to sell him stock individually, that the stock was being taken at less than par. This was a month or two prior to the time the bank extended its credit to the corporation, and it was not shown that such credit was extended through the agency of the president. *Held*, that the evidence was not sufficient to charge the bank with notice of the manner of issuing the stock." *Held*, further: "Though parties have been informed of the issuance of stock below par by a corporation, such information has not the characteristics of notice in law, unless the transaction to be affected thereby took place under such circumstances as would lead to the reasonable conclusion that the fact reported was still remembered."

In Bank v. Christopher, 40 N. J. Law, 435, it is held:

"A bank discounting a note before its maturity is not chargeable with the knowledge of illegality or want of consideration acquired by one of its directors in other than his official capacity, such director not having acted with the board in making the discount. (2) A director offering a note, of which he is owner, to the bank, of which he is a director, for discount, is regarded in the transaction as a stranger, and the bank is not chargeable with the knowledge of such director of an infirmity or defect in the consideration of the note."

The diligence of counsel has been rewarded by the discovery of many other cases cited for the aid of the court, some of which are not accessible, and others throw more or less light upon the questions involved. Those to which I have referred are ample to estab-

lish the doctrine announced, and are in harmony with the great weight of authority. Nor do I think they are irreconcilably in conflict with the cases cited by the counsel for the complainant, which the court is of the opinion are not applicable to the facts in the case at bar. I conclude, therefore, that the lien created by the pledge to the plaintiff cannot prevail over that of the bank.

It was urged at the hearing that the bank had waived its lien. In the examination of the case the court has not overlooked that contention, but the court is of the opinion that no facts found in this case raise the question of estoppel or a waiver. The plaintiff has not been misled by any action of the bank, and the bank did not waive the lien given to it by statute by endeavoring to make its debts more secure by getting the certificates of stock issued to Hynes into its own possession.